(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## OUR LADY OF GUADALUPE SCHOOL *v.* MORRISSEY-BERRU

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 19–267.   Argued May 11, 2020—Decided July 8, 2020*

The First Amendment protects the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff* v. *Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U. S. 94, 116.  Applying this principle, this Court held in *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC,* 565 U. S. 171, that the First Amendment barred a court from entertaining an employment discrimination claim brought by an elementary school teacher, Cheryl Perich, against the religious school where she taught. Adopting the so-called "ministerial exception" to laws governing the employment relationship between a religious institution and certain key employees, the Court found relevant Perich's title as a "Minister of Religion, Commissioned," her educational training, and her responsibility to teach religion and participate with students in religious activities. *Id.*, at 190–191.

   In these cases, two elementary school teachers at Roman Catholic schools in the Archdiocese of Los Angeles had teaching responsibilities similar to Perich's.  Agnes Morrissey-Berru taught at Our Lady of Guadalupe School (OLG), and Kristen Biel taught at St. James School. Both were employed under nearly identical agreements that set out the schools' mission to develop and promote a Catholic School faith community; imposed commitments regarding religious instruction, worship, and personal modeling of the faith; and explained that teachers' performance would be reviewed on those bases.  Each was also

——————

* Together with No. 19–348, *St. James School* v. *Biel, as Personal Representative of the Estate of Biel*, on certiorari to the same Court.

required to comply with her school's faculty handbook, which set out similar expectations. Each taught religion in the classroom, worshipped with her students, prayed with her students, and had her performance measured on religious bases.

Both teachers sued their schools after their employment was terminated. Morrissey-Berru claimed that OLG had demoted her and had failed to renew her contract in order to replace her with a younger teacher in violation of the Age Discrimination in Employment Act of 1967. OLG invoked *Hosanna-Tabor*'s "ministerial exception" and successfully moved for summary judgment, but the Ninth Circuit reversed, holding that Morrissey-Berru did not fall within the exception because she did not have the formal title of "minister," had limited formal religious training, and did not hold herself out publicly as a religious leader. Biel alleged that St. James discharged her because she had requested a leave of absence to obtain breast cancer treatment. Like OLG, St. James obtained summary judgment under the "ministerial exception." But the Ninth Circuit reversed, reasoning that Biel lacked Perich's credentials, religious training, and ministerial background.

*Held*: The First Amendment's Religion Clauses foreclose the adjudication of Morrissey-Berru's and Biel's employment-discrimination claims. Pp. 10–27.

(a) The independence of religious institutions in matters of "faith and doctrine" is closely linked to independence in what the Court has termed " 'matters of church government.' " *Hosanna-Tabor*, 565 U. S., at 186. For this reason, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions. Pp. 10–11.

(b) When the "ministerial exception" reached this Court in *Hosanna-Tabor*, the Court looked to precedent and the "background" against which "the First Amendment was adopted," 565 U. S., at 183, and unanimously recognized that the Religion Clauses foreclose certain employment-discrimination claims brought against religious organizations, *id.*, at 188. Pp. 11–14.

(c) In *Hosanna-Tabor*, the Court applied the "ministerial exception" but declined "to adopt a rigid formula for deciding when an employee qualifies as a minister." 565 U. S., at 190. Instead, the Court identified four relevant circumstances of Perich's employment at an Evangelical Lutheran school. First, Perich's church had given her the title of "minister, with a role distinct from that of most of its members." *Id.*, at 191. Second, her position "reflected a significant degree of religious training followed by a formal process of commissioning." *Ibid.* Third, she "held herself out as a minister of the Church" and claimed certain tax benefits. *Id.*, at 191–192. Fourth, her "job duties reflected a role

in conveying the Church's message and carrying out its mission." *Id.*, at 192. Pp. 14–16.

(d) A variety of factors may be important in determining whether a particular position falls within the ministerial exception. The circumstances that informed the Court's decision in *Hosanna-Tabor* were relevant because of their relationship to Perich's "role in conveying the Church's message and carrying out its mission." 565 U. S., at 192. But the recognition of the significance of those factors in Perich's case did not mean that they must be met in all other cases. What matters is what an employee does. Implicit in the *Hosanna-Tabor* decision was a recognition that educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of a private religious school's mission. Pp. 16–21.

(e) Applying this understanding of the Religion Clauses here, it is apparent that Morrissey-Berru and Biel qualify for the exception recognized in *Hosanna-Tabor*. There is abundant record evidence that they both performed vital religious duties, such as educating their students in the Catholic faith and guiding their students to live their lives in accordance with that faith. Their titles did not include the term "minister" and they had less formal religious training than Perich, but their core responsibilities were essentially the same. And their schools expressly saw them as playing a vital role in carrying out the church's mission. A religious institution's explanation of the role of its employees in the life of the religion in question is important. Pp. 21–22.

(f) The Ninth Circuit mistakenly treated the circumstances the Court found relevant in *Hosanna-Tabor* as a checklist of items to be assessed and weighed against each other. That rigid test produced a distorted analysis. First, it invested undue significance in the fact that Morrissey-Berru and Biel did not have clerical titles. Second, it assigned too much weight to the fact that Morrissey-Berru and Biel had less formal religious schooling that Perich. Third, the *St. James* panel inappropriately diminished the significance of Biel's duties. Respondents would make *Hosanna-Tabor*'s governing test even more rigid. And they go further astray in suggesting that an employee can never come within the *Hosanna-Tabor* exception unless the employee is a "practicing" member of the religion with which the employer is associated. Deciding such questions risks judicial entanglement in religious issues. Pp. 22–27.

No. 19–267, 769 Fed. Appx. 460; No. 19–348, 911 F. 3d 603, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined.

THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined.  SO-
TOMAYOR, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 19–267 and 19–348

---

## OUR LADY OF GUADALUPE SCHOOL, PETITIONER
19–267    *v.*
### AGNES MORRISSEY-BERRU

## ST. JAMES SCHOOL, PETITIONER
19–348    *v.*
### DARRYL BIEL, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF KRISTEN BIEL

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[July 8, 2020]

JUSTICE ALITO delivered the opinion of the Court.

These cases require us to decide whether the First Amendment permits courts to intervene in employment disputes involving teachers at religious schools who are entrusted with the responsibility of instructing their students in the faith. The First Amendment protects the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff* v. *Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U. S. 94, 116 (1952). Applying this principle, we held in *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171 (2012), that the First Amendment barred a court from entertaining an employment discrimination claim brought by an elementary school teacher,

Cheryl Perich, against the religious school where she taught.  Our decision built on a line of lower court cases adopting what was dubbed the "ministerial exception" to laws governing the employment relationship between a religious institution and certain key employees.  We did not announce "a rigid formula" for determining whether an employee falls within this exception, but we identified circumstances that we found relevant in that case, including Perich's title as a "Minister of Religion, Commissioned," her educational training, and her responsibility to teach religion and participate with students in religious activities. *Id.*, at 190–191.

In the cases now before us, we consider employment discrimination claims brought by two elementary school teachers at Catholic schools whose teaching responsibilities are similar to Perich's.  Although these teachers were not given the title of "minister" and have less religious training than Perich, we hold that their cases fall within the same rule that dictated our decision in *Hosanna-Tabor*.  The religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission. Judicial review of the way in which religious schools discharge those responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate.

I

A

1

The first of the two cases we now decide involves Agnes Morrissey-Berru, who was employed at Our Lady of Guadalupe School (OLG), a Roman Catholic primary school in the Archdiocese of Los Angeles.  Excerpts of Record (ER) 58 in

No. 17–56624 (CA9) (OLG).[1]  For many years, Morrissey-Berru was employed at OLG as a lay fifth or sixth grade teacher.  Like most elementary school teachers, she taught all subjects, and since OLG is a Catholic school, the curriculum included religion.  App. 23, 75.  As a result, she was her students' religion teacher.

Morrissey-Berru earned a B. A. in English Language Arts, with a minor in secondary education, and she holds a California teaching credential.  *Id.*, at 21–22.  While on the faculty at OLG, she took religious education courses at the school's request, ER 41–ER 42, ER 44–ER 45, ER 276, and was expected to attend faculty prayer services, App. to Pet. for Cert. in No. 19–267, p. 87a.[2]

——————

[1] A major theme of the dissent is that we do not heed the rule that, in deciding whether summary judgment is proper, a court must view the facts in the light most favorable to the party against whom summary judgment is sought. See *post*, at 1–2, 8, 10–11, 14 (opinion of SOTOMAYOR, J.).  But the dissent, which approves of the Ninth Circuit's reasoning, seems to forget that the Ninth Circuit in effect granted summary judgment *in favor of the teachers* on the issue of the applicability of the so-called ministerial exception.  It did not remand for a trial on that issue but instead held that the exception did not apply.  769 Fed. Appx. 460, 460–461 (2019); 911 F. 3d 603, 605, 611, n. 6 (2018).  Therefore, if any material facts were genuinely in dispute, the relevant parts of the record would have to be viewed in the light most favorable to the schools.  The dissent, however, does exactly the opposite.

In any event, the dissent's comments about summary judgment are so much smoke.  It does not identify any disputed fact that is essential to our holding, and, although there are differences of opinion on certain facts, neither party takes the position that any *material* fact is genuinely in dispute.

[2] After bringing suit, Morrissey-Berru filed a declaration stating that she is "not currently a practicing Catholic."  ER 248.  It is unclear what Morrissey-Berru means by "practicing."  There is, however, no hint in the record that Morrissey-Berru considered herself a non-practicing Catholic during her employment at OLG.  See *infra*, at 5 (describing religious observation).

Each year, Morrissey-Berru and OLG entered into an employment agreement, App. 21,[3] that set out the school's "mission" and Morrissey-Berru's duties. See, *e.g.*, *id.*, at 154–164.[4] The agreement stated that the school's mission was "to develop and promote a Catholic School Faith Community," *id.*, at 154, and it informed Morrissey-Berru that "[a]ll [her] duties and responsibilities as a Teache[r were to] be performed within this overriding commitment." *Ibid.*

The agreement explained that the school's hiring and retention decisions would be guided by its Catholic mission, and the agreement made clear that teachers were expected to "model and promote" Catholic "faith and morals." *Id.*, at 155. Under the agreement, Morrissey-Berru was required to participate in "[s]chool liturgical activities, as requested," *ibid.*, and the agreement specified that she could be terminated "for 'cause'" for failing to carry out these duties or for "conduct that brings discredit upon the School or the Roman Catholic Church." *Id.*, at 155–157. The agreement required compliance with the faculty handbook, which sets out similar expectations. *Id.*, at 156; App. to Pet. for Cert. in No. 19–267, at 52a–55a. The pastor of the parish, a Catholic priest, had to approve Morrissey-Berru's hiring each year. *Id.*, at 14a; see also App. 164.

Like all teachers in the Archdiocese of Los Angeles, Morrissey-Berru was "considered a catechist," *i.e.*, "a teacher of religio[n]." App. to Pet. for Cert. in No. 19–267, at 56a, 60a. Catechists are "responsible for the faith formation of the students in their charge each day." *Id.*, at

––––––––––

[3] This appears to have been a standard contract used within the Archdiocese of Los Angeles. See App. 154; cf. *id.*, at 230.

[4] It is not entirely clear from the record whether teachers at OLG must be Catholic. *Id.*, at 113 ("[Q.] 'Is it a requirement that a teacher be Catholic in order to teach at OLG School? Yes or no?' [A.] Yes"); but see *ibid.* ("Exceptions can be made"); *id.*, at 154 ("*If* you are Roman Catholic[,] you must be in good standing with the Church" (emphasis added)). But it is clearly preferred. *Id.*, at 110.

56a. Morrissey-Berru provided religious instruction every day using a textbook designed for use in teaching religion to young Catholic students. *Id.*, at 45a–51a, 90a–92a; see App. 79–80. Under the prescribed curriculum, she was expected to teach students, among other things, "to learn and express belief that Jesus is the son of God and the Word made flesh"; to "identify the ways" the church "carries on the mission of Jesus"; to "locate, read and understand stories from the Bible"; to "know the names, meanings, signs and symbols of each of the seven sacraments"; and to be able to "explain the communion of saints." App. to Pet. for Cert. in No. 19–267, at 91a–92a. She tested her students on that curriculum in a yearly exam. *Id.*, at 87a. She also directed and produced an annual passion play. *Id.*, at 26a.

Morrissey-Berru prepared her students for participation in the Mass and for communion and confession. *Id.*, at 68a, 81a, 88a–89a. She also occasionally selected and prepared students to read at Mass. *Id.*, at 83a, 89a. And she was expected to take her students to Mass once a week and on certain feast days (such as the Feast Day of St. Juan Diego, All Saints Day, and the Feast of Our Lady), and to take them to confession and to pray the Stations of the Cross. *Id.*, at 68a–69a, 83a, 88a. Each year, she brought them to the Catholic Cathedral in Los Angeles, where they participated as altar servers. *Id.*, at 95a–96a. This visit, she explained, was "an important experience" because "[i]t is a big honor" for children to "serve the altar" at the cathedral. *Id.*, at 96a.

Morrissey-Berru also prayed with her students. Her class began or ended every day with a Hail Mary. *Id.*, at 87a. She led the students in prayer at other times, such as when a family member was ill. *Id.*, at 21a, 81a, 86a–87a. And she taught them to recite the Apostle's Creed and the Nicene Creed, as well as prayers for specific purposes, such as in connection with the sacrament of confession. *Id.*, at 20a–21a, 92a.

The school reviewed Morrissey-Berru's performance under religious standards. The "'Classroom Observation Report'" evaluated whether Catholic values were "infused through all subject areas" and whether there were religious signs and displays in the classroom. *Id.*, at 94a, 95a; App. 59. Morrissey-Berru testified that she tried to instruct her students "in a manner consistent with the teachings of the Church," App. to Pet. for Cert. in No. 19–267, at 96a, and she said that she was "committed to teaching children Catholic values" and providing a "faith-based education." *Id.*, at 82a. And the school principal confirmed that Morrissey-Berru was expected to do these things.[5]

2

In 2014, OLG asked Morrissey-Berru to move from a full-time to a part-time position, and the next year, the school declined to renew her contract. She filed a claim with the Equal Employment Opportunity Commission (EEOC), received a right-to-sue letter, App. 169, and then filed suit under the Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U. S. C. §621 *et seq.*, claiming that the school had demoted her and had failed to renew her contract so that it could replace her with a younger teacher. App. 168–169. The school maintains that it based its decisions on classroom performance—specifically, Morrissey-Berru's difficulty in administering a new reading and writing program, which had been introduced by the school's new principal as part of an effort to maintain accreditation and improve the school's academic program. App. to Pet. for Cert. in No. 19–267, at 66a–67a, 70a, 73a.

Invoking the "ministerial exception" that we recognized in *Hosanna-Tabor*, OLG successfully moved for summary judgment, but the Ninth Circuit reversed in a brief opinion. 769 Fed. Appx. 460, 461 (2019). The court acknowledged

—————

[5] Record in No. 2:16–CV–09353 (CD Cal.), Doc. 33, ¶9.

that Morrissey-Berru had "significant religious responsibilities" but reasoned that "an employee's duties alone are not dispositive under *Hosanna-Tabor*'s framework." *Ibid.* Unlike Perich, the court noted, Morrissey-Berru did not have the formal title of "minister," had limited formal religious training, and "did not hold herself out to the public as a religious leader or minister." *Ibid.* In the court's view, these "factors" outweighed the fact that she was invested with significant religious responsibilities. *Ibid.* The court therefore held that Morrissey-Berru did not fall within the "ministerial exception." OLG filed a petition for certiorari, and we granted review.

## B

### 1

The second case concerns the late Kristen Biel, who worked for about a year and a half as a lay teacher at St. James School, another Catholic primary school in Los Angeles. For part of one academic year, Biel served as a long-term substitute teacher for a first grade class, and for one full year she was a full-time fifth grade teacher. App. 336–337. Like Morrissey-Berru, she taught all subjects, including religion. *Id.*, at 288; ER 588 in No. 17–55180 (CA9) (St. James).[6]

Biel had a B. A. in liberal studies and a teaching credential. App. 244. During her time at St. James, she attended a religious conference that imparted "[d]ifferent techniques on teaching and incorporating God" into the classroom. *Id.*, at 260–262. Biel was Catholic.[7]

Biel's employment agreement was in pertinent part nearly identical to Morrissey-Berru's. Compare *id.*, at 154–

_____

[6] Biel died during the pendency of this suit, which has subsequently been litigated by her husband as representative of her estate. Record in No. 17–55180 (CA9), Docs. 112, 113.

[7] The school principal stated that she prefers that teachers at the school be Catholic. ER 32 (St. James).

164, with *id.*, at 320–329. The agreement set out the same
religious mission; required teachers to serve that mission;
imposed commitments regarding religious instruction, wor-
ship, and personal modeling of the faith; and explained that
teachers' performance would be reviewed on those bases.

Biel's agreement also required compliance with the St.
James faculty handbook, which resembles the OLG hand-
book. *Id.*, at 322. Compare ER 641–ER 651 (OLG) with ER
565–ER 597 (St. James). The St. James handbook defines
"religious development" as the school's first goal and pro-
vides that teachers must "mode[l] the faith life," "exem-
plif[y] the teachings of Jesus Christ," "integrat[e] Catholic
thought and principles into secular subjects," and
"prepar[e] students to receive the sacraments." *Id.,* at
ER 570–ER 572. The school principal confirmed these
expectations.[8]

Like Morrissey-Berru, Biel instructed her students in the
tenets of Catholicism. She was required to teach religion
for 200 minutes each week, App. 257–258, and adminis-
tered a test on religion every week, *id.*, at 256–257. She
used a religion textbook selected by the school's principal, a
Catholic nun. *Id.*, at 255; ER 37 (St. James). The religious
curriculum covered "the norms and doctrines of the Catho-
lic Faith, including . . . the sacraments of the Catholic
Church, social teachings according to the Catholic Church,
morality, the history of Catholic saints, [and] Catholic pray-
ers." App. to Pet. for Cert. in No. 19–348, p. 83a.

Biel worshipped with her students. At St. James, teach-
ers are responsible for "prepar[ing] their students to be ac-
tive participants at Mass, with particular emphasis on
Mass responses," ER 587, and Biel taught her students
about "Catholic practices like the Eucharist and confes-
sion," *id.*, at ER 226–ER 227. At monthly Masses, she
prayed with her students. App. to Pet. for Cert. in No. 19–

─────────
[8] Record in No. 2:15–CV–04248 (CD Cal.), Doc. 67–1, ¶¶4–7.

348, at 82a, 94a–96a. Her students participated in the liturgy on some occasions by presenting the gifts (bringing bread and wine to the priest). *Ibid.*

Teachers at St. James were "required to pray with their students every day," *id.*, at 80a–81a, 110a, and Biel observed this requirement by opening and closing each school day with prayer, including the Lord's Prayer or a Hail Mary, *id.*, at 81a–82a, 93a, 110a.

As at OLG, teachers at St. James are evaluated on their fulfillment of the school's religious mission. *Id.*, at 83a–84a. St. James used the same classroom observation standards as OLG and thus examined whether teachers "infus[ed]" Catholic values in all their teaching and included religious displays in their classrooms. *Id.*, at 83a–84a, 92a. The school's principal, a Catholic nun, evaluated Biel on these measures. *Id.*, at 106a.

2

St. James declined to renew Biel's contract after one full year at the school. She filed charges with the EEOC, and after receiving a right-to-sue letter, brought this suit, alleging that she was discharged because she had requested a leave of absence to obtain treatment for breast cancer. App. 337–338. The school maintains that the decision was based on poor performance—namely, a failure to observe the planned curriculum and keep an orderly classroom. See *id.*, at 303; App. to Pet. for Cert. in No. 19–348, at 85a–89a, 114a–115a, 120a–121a.

Like OLG, St. James obtained summary judgment under the ministerial exception, *id.*, at 74a, but a divided panel of the Ninth Circuit reversed, reasoning that Biel lacked Perich's "credentials, training, [and] ministerial background," 911 F. 3d 603, 608 (2018).

Judge D. Michael Fisher, sitting by designation, dissented. Considering the totality of the circumstances, he

would have held that the ministerial exception applied "because of the substance reflected in [Biel's] title and the important religious functions she performed" as a "stewar[d] of the Catholic faith to the children in her class." *Id.*, at 621, 622.

An unsuccessful petition for rehearing en banc ensued. Judge Ryan D. Nelson, joined by eight other judges, dissented. 926 F. 3d 1238, 1239 (2019). Judge Nelson faulted the panel majority for "embrac[ing] the narrowest construction" of the ministerial exception, departing from "the consensus of our sister circuits that the employee's ministerial function should be the key focus," and demanding nothing less than a "carbon copy" of the specific facts in *Hosanna-Tabor. Ibid.* We granted review and consolidated the case with OLG's. 589 U. S. \_\_\_ (2019).

## II

## A

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Among other things, the Religion Clauses protect the right of churches and other religious institutions to decide matters "'of faith and doctrine'" without government intrusion. *Hosanna-Tabor*, 565 U. S., at 186 (quoting *Kedroff*, 344 U. S., at 116). State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion.

The independence of religious institutions in matters of "faith and doctrine" is closely linked to independence in what we have termed "'matters of church government.'" 565 U. S., at 186. This does not mean that religious institutions enjoy a general immunity from secular laws, but it

does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission. And a component of this autonomy is the selection of the individuals who play certain key roles.

The "ministerial exception" was based on this insight. Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions. The rule appears to have acquired the label "ministerial exception" because the individuals involved in pioneering cases were described as "ministers." See *McClure* v. *Salvation Army*, 460 F. 2d 553, 558–559 (CA5 1972); *Rayburn* v. *General Conference of Seventh-day Adventists*, 772 F. 2d 1164, 1168 (CA4 1985). Not all pre-*Hosanna-Tabor* decisions applying the exception involved "ministers" or even members of the clergy. See, *e.g., EEOC* v. *Southwestern Baptist Theological Seminary*, 651 F. 2d 277, 283–284 (CA5 1981); *EEOC* v. *Roman Catholic Diocese of Raleigh, N. C.*, 213 F. 3d 795, 800–801 (CA4 2000). But it is instructive to consider why a church's independence on matters "of faith and doctrine" requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities. Without that power, a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith.[9] The ministerial exception was recognized to preserve a church's independent authority in such matters.

### B

When the so-called ministerial exception finally reached this Court in *Hosanna-Tabor*, we unanimously recognized

---

[9] Cf. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2141 (2003) (politically appointed ministers in colonial Virginia were, in the view of the faithful, often "less than zealous in their spiritual responsibilities and less than irreproachable in their personal morals").

that the Religion Clauses foreclose certain employment discrimination claims brought against religious organizations. 565 U. S., at 188. The constitutional foundation for our holding was the general principle of church autonomy to which we have already referred: independence in matters of faith and doctrine and in closely linked matters of internal government. The three prior decisions on which we primarily relied drew on this broad principle, and none was exclusively concerned with the selection or supervision of clergy. *Watson* v. *Jones*, 13 Wall. 679 (1872), involved a dispute about the control of church property, and both *Kedroff*, 344 U. S. 94, and *Serbian Eastern Orthodox Diocese for United States and Canada* v. *Milivojevich*, 426 U. S. 696 (1976), also concerned the control of property, as well as the appointment and authority of bishops.

In addition to these precedents, we looked to the "background" against which "the First Amendment was adopted." *Hosanna-Tabor*, 565 U. S., at 183. We noted that 16th-century British statutes had given the Crown the power to fill high "religious offices" and to control the exercise of religion in other ways, and we explained that the founding generation sought to prevent a repetition of these practices in our country. *Ibid.* Because Cheryl Perich, the teacher in *Hosanna-Tabor*, had a title that included the word "minister," we naturally concentrated on historical events involving clerical offices, but the abuses we identified were not limited to the control of appointments.

We pointed to the various Acts of Uniformity, *id.*, at 182, which dictated what ministers could preach and imposed penalties for non-compliance. Under the 1549 Act, a minister who "preach[ed,] declare[d,] or [spoke] any thing" in derogation of any part of the Book of Common Prayer could be sentenced to six months in jail for a first offense and life imprisonment for a third violation. Act of Uniformity, 2 & 3 Edw. 6, ch. 1. In addition, all other English subjects were forbidden to say anything against the Book of Common

Prayer in "[i]nterludes[,] play[s,] song[s,] r[h]ymes, or by other open [w]ord[s]." *Ibid.* A 1559 law contained similar prohibitions. See Act of Uniformity, 1 Eliz., ch. 2.

After the Restoration, Parliament enacted a new law with a similar aim. Ministers and "Lecturer[s]" were required to pledge "unfeigned assent and consent" to the Book of Common Prayer, and all schoolmasters, private tutors, and university professors were required to "conforme to the Liturgy of the Church of England" and not "to endeavour any change or alteration" of the church. Act of Uniformity, 1662, 14 Car. 2, ch. 4.

British law continued to impose religious restrictions on education in the 18th century and past the time of the adoption of the First Amendment. The Schism or Established Church Act of 1714, 13 Ann., ch. 7, required that schoolmasters and tutors be licensed by a bishop. Non-conforming Protestants, as well as Catholics and Jews, could not teach at or attend the two universities, and as Blackstone wrote, "[p]ersons professing the popish religion [could] not keep or teach any school under pain of perpetual imprisonment." 4 W. Blackstone, Commentaries on the Laws of England 55 (8th ed. 1778). The law also imposed penalties on "any person [who] sen[t] another abroad to be educated in the popish religion . . . or [who] contribute[d] to their maintenance when there." *Id.*, at 55–56.

British colonies in North America similarly controlled both the appointment of clergy, see *Hosanna-Tabor*, 565 U. S., at 183, and the teaching of students. A Maryland law "prohibited any Catholic priest or lay person from keeping school, or taking upon himself the education of youth." 2 T. Hughes, History of the Society of Jesus in North America: Colonial and Federal 443–444 (1917). In 1771, the Governor of New York was instructed to require that all schoolmasters arriving from England obtain a license from the Bishop of London. 3 C. Lincoln, The Constitutional History of New York 485, 745 (1906). New York law also required

an oath and license for any "'vagrant Preacher, Moravian, or disguised Papist'" to "'Preach or Teach, Either in Public or Private.'" S. Cobb, The Rise of Religious Liberty in America 358 (1902).

C

In *Hosanna-Tabor*, Cheryl Perich, a kindergarten and fourth grade teacher at an Evangelical Lutheran school, filed suit in federal court, claiming that she had been discharged because of a disability, in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U. S. C. §12112(a). The school responded that the real reason for her dismissal was her violation of the Lutheran doctrine that disputes should be resolved internally and not by going to outside authorities. We held that her suit was barred by the "ministerial exception" and noted that it "concern[ed] government interference with an internal church decision that affects the faith and mission of the church." 565 U. S., at 190. We declined "to adopt a rigid formula for deciding when an employee qualifies as a minister," and we added that it was "enough for us to conclude, in this our first case involving the ministerial exception, that the exception covers Perich, given all the circumstances of her employment." *Id.*, at 190–191. We identified four relevant circumstances but did not highlight any as essential.

First, we noted that her church had given Perich the title of "minister, with a role distinct from that of most of its members." *Id.*, at 191. Although she was not a minister in the usual sense of the term—she was not a pastor or deacon, did not lead a congregation, and did not regularly conduct religious services—she was classified as a "called" teacher, as opposed to a lay teacher, and after completing certain academic requirements, was given the formal title "'Minister of Religion, Commissioned.'" *Id.*, at 177–178, 191.

Second, Perich's position "reflected a significant degree of

religious training followed by a formal process of commissioning." *Id.*, at 191.

Third, "Perich held herself out as a minister of the Church by accepting the formal call to religious service, according to its terms," and by claiming certain tax benefits. *Id.*, at 191–192.

Fourth, "Perich's job duties reflected a role in conveying the Church's message and carrying out its mission." *Id.*, at 192. The church charged her with "'lead[ing] others toward Christian maturity'" and "'teach[ing] faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church.'" *Ibid.* Although Perich also provided instruction in secular subjects, she taught religion four days a week, led her students in prayer three times a day, took her students to a chapel service once a week, and participated in the liturgy twice a year. "As a source of religious instruction," we explained, "Perich performed an important role in transmitting the Lutheran faith to the next generation." *Ibid.*

The case featured two concurrences. In the first, JUSTICE THOMAS stressed that courts should "defer to a religious organization's good-faith understanding of who qualifies as its minister." *Id.*, at 196. That is so, JUSTICE THOMAS explained, because "[a] religious organization's right to choose its ministers would be hollow . . . if secular courts could second-guess" the group's sincere application of its religious tenets. *Id.*, at 197.

The second concurrence argued that application of the "ministerial exception" should "focus on the function performed by persons who work for religious bodies" rather than labels or designations that may vary across faiths. *Id.*, at 198 (opinion of ALITO, J., joined by KAGAN, J.). This opinion viewed the title of "minister" as "relevant" but "neither necessary nor sufficient." *Id.*, at 202. It noted that "most faiths do not employ the term 'minister'" and that some

"consider the ministry to consist of all or a very large per-
centage of their members." *Ibid.* The opinion concluded
that the "'ministerial' exception" "should apply to any 'em-
ployee' who leads a religious organization, conducts wor-
ship services or important religious ceremonies or rituals,
or serves as a messenger or teacher of its faith." *Id.*, at 199.

## D

### 1

In determining whether a particular position falls within
the *Hosanna-Tabor* exception, a variety of factors may be
important.[10] The circumstances that informed our decision
in *Hosanna-Tabor* were relevant because of their relation-
ship to Perich's "role in conveying the Church's message
and carrying out its mission," *id.*, at 192, but the other
noted circumstances also shed light on that connection. In
a denomination that uses the term "minister," conferring
that title naturally suggests that the recipient has been
given an important position of trust. In Perich's case, the
title that she was awarded and used demanded satisfaction
of significant academic requirements and was conferred
only after a formal approval process, *id.*, at 191, and those
circumstances also evidenced the importance attached to
her role, *ibid.* But our recognition of the significance of
those factors in Perich's case did not mean that they must

_____

[10] In considering the circumstances of any given case, courts must take
care to avoid "resolving underlying controversies over religious doctrine."
*Presbyterian Church in U. S.* v. *Mary Elizabeth Blue Hull Memorial Pres-
byterian Church*, 393 U. S. 440, 449 (1969); *ibid.* ("First Amendment val-
ues are plainly jeopardized when . . . litigation is made to turn on the
resolution by civil courts of controversies over religious doctrine and
practice"); see also *Serbian Eastern Orthodox Diocese for United States
and Canada* v. *Milivojevich*, 426 U. S. 696, 715, n. 8 (1976) ("'It is not to
be supposed that the judges of the civil courts can be as competent in the
ecclesiastical law and religious faith of all these bodies as the ablest men
in each are in reference to their own'" (quoting *Watson* v. *Jones*, 13 Wall.
679, 729 (1872))); cf. *Thomas* v. *Review Bd. of Ind. Employment Security
Div.*, 450 U. S. 707, 714–716 (1981).

be met—or even that they are necessarily important—in all other cases.

Take the question of the title "minister." Simply giving an employee the title of "minister" is not enough to justify the exception. And by the same token, since many religious traditions do not use the title "minister," it cannot be a necessary requirement. Requiring the use of the title would constitute impermissible discrimination, and this problem cannot be solved simply by including positions that are thought to be the counterparts of a "minister," such as priests, nuns, rabbis, and imams. See Brief for Respondents 21. Nuns are not the same as Protestant ministers. A brief submitted by Jewish organizations makes the point that "Judaism has many 'ministers,'" that is, "the term 'minister' encompasses an extensive breadth of religious functionaries in Judaism."[11] For Muslims, "an inquiry into whether imams or other leaders bear a title equivalent to 'minister' can present a troubling choice between denying a central pillar of Islam—*i.e.*, the equality of all believers— and risking loss of ministerial exception protections."[12]

If titles were all-important, courts would have to decide which titles count and which do not, and it is hard to see how that could be done without looking behind the titles to what the positions actually entail. Moreover, attaching too much significance to titles would risk privileging religious traditions with formal organizational structures over those that are less formal.

For related reasons, the academic requirements of a position may show that the church in question regards the position as having an important responsibility in elucidating or teaching the tenets of the faith. Presumably the purpose

--------

[11] Brief for Colpa et al. as *Amici Curiae* i, 3 (quotation modified).
[12] Brief for Asma T. Uddin as *Amicus Curiae* 2.

of such requirements is to make sure that the person hold-
ing the position understands the faith and can explain it
accurately and effectively.  But insisting in every case on
rigid academic requirements could have a distorting effect.
This is certainly true with respect to teachers.  Teaching
children in an elementary school does not demand the same
formal religious education as teaching theology to divinity
students.  Elementary school teachers often teach secular
subjects in which they have little if any special training.  In
addition, religious traditions may differ in the degree of for-
mal religious training thought to be needed in order to
teach.  See, *e.g.*, Brief for Ethics and Religious Liberty Com-
mission of the Southern Baptist Convention et al. as *Amici
Curiae* 12 ("many Protestant groups have historically re-
jected any requirement of formal theological training").  In
short, these circumstances, while instructive in *Hosanna-
Tabor*, are not inflexible requirements and may have far
less significance in some cases.

What matters, at bottom, is what an employee does.  And
implicit in our decision in *Hosanna-Tabor* was a recognition
that educating young people in their faith, inculcating its
teachings, and training them to live their faith are respon-
sibilities that lie at the very core of the mission of a private
religious school.  As we put it, Perich had been entrusted
with the responsibility of "transmitting the Lutheran faith
to the next generation."  565 U. S., at 192.  One of the con-
currences made the same point, concluding that the excep-
tion should include "any 'employee' who leads a religious
organization, conducts worship services or important reli-
gious ceremonies or rituals, or serves as a messenger or
*teacher of its faith*."  *Id.*, at 199 (opinion of ALITO, J.) (em-
phasis added).

Religious education is vital to many faiths practiced in
the United States.  This point is stressed by briefs filed in
support of OLG and St. James by groups affiliated with a

wide array of faith traditions. In the Catholic tradition, religious education is "'intimately bound up with the whole of the Church's life.'" Catechism of the Catholic Church 8 (2d ed. 2016). Under canon law, local bishops must satisfy themselves that "those who are designated teachers of religious instruction in schools . . . are outstanding in correct doctrine, the witness of a Christian life, and teaching skill." Code of Canon Law, Canon 804, §2 (Eng. transl. 1998).

Similarly, Protestant churches, from the earliest settlements in this country, viewed education as a religious obligation. A core belief of the Puritans was that education was essential to thwart the "chief project of that old deluder, Satan, to keep men from the knowledge of the Scriptures."[13] Thus, in 1647, the Massachusetts General Court passed what has been called the Old Deluder Satan Act requiring every sizable town to establish a school.[14] Most of the oldest educational institutions in this country were originally established by or affiliated with churches, and in recent years, non-denominational Christian schools have proliferated with the aim of inculcating Biblical values in their students.[15] Many such schools expressly set themselves apart from public schools that they believe do not reflect their values.[16]

Religious education is a matter of central importance in

—————————

[13] Old Deluder Satan Act of 1647, in The Laws and Liberties of Massachusetts 47 (M. Farrand ed. 1929).

[14] *Ibid.*

[15] See P. Parsons, Inside America's Christian Schools (1987); see also Association of Christian Schools International, Why Christian Schooling?, https://www.acsi.org/membership/why-christian-schooling; Association of Classical Christian Schools, What is CCE?, https://classicalchristian.org/what-is-cce/?v=a44707111a05.

[16] R. Dreher, The Benedict Option 146, 155, 160 (2017); see, *e.g.*, J. Ekeland & B. Walton, Discover Christian Schools: Ten Differences, https://discoverchristianschools.com/wp-content/uploads/2019/02/DCS_TenDifferences.pdf.

Judaism.  As explained in briefs submitted by Jewish organizations, the Torah is understood to require Jewish parents to ensure that their children are instructed in the faith.[17]  One brief quotes Maimonides's statement that religious instruction "is an obligation of the highest order, entrusted only to a schoolteacher possessing 'fear of Heaven.'"[18]  "The contemporary American Jewish community continues to place the education of children in its faith and rites at the center of its communal efforts."[19]

Religious education is also important in Islam.  "[T]he acquisition of at least rudimentary knowledge of religion and its duties [is] mandatory for the Muslim individual."[20]  This precept is traced to the Prophet Muhammad, who proclaimed that "'[t]he pursuit of knowledge is incumbent on every Muslim.'"[21]  "[T]he development of independent private Islamic schools ha[s] become an important part of the picture of Muslim education in America."[22]

The Church of Jesus Christ of Latter-day Saints has a long tradition of religious education, with roots in revelations given to Joseph Smith.  See Doctrine and Covenants of the Church of Jesus Christ of Latter-day Saints §93:36 (2013).  "The Church Board of Education has established elementary, middle, or secondary schools in which both secular and religious instruction is offered."[23]

--------

[17] See Deuteronomy 6:7, 11:19.

[18] Brief for General Conference of Seventh-day Adventists et al. as *Amici Curiae* 7–8 (quoting Maimonides, Mishne Torah, Hilkhot Talmud Torah 1:2; 2:1, 3).

[19] Brief for Church of God in Christ, Inc., et al. as *Amici Curiae* 15.

[20] Afsaruddin, Muslim Views on Education: Parameters, Purview, and Possibilities, 44 J. Cath. Legal Studies 143, 143–144 (2005).

[21] *Id.*, at 143.

[22] Haddad & Smith, Introduction: The Challenge of Islamic Education in North America, in Educating the Muslims of America 3, 6, 11 (Y. Haddad, F. Senzai, & J. Smith eds. 2009).

[23] Berrett, Church Educational System (CES) in 1 Encyclopedia of Mormonism 274, 275 (D. Ludlow ed. 1992).

Seventh-day Adventists "trace the importance of educa-tion back to the Garden of Eden."[24]  Seventh-day Adventist formation "restore[s] human beings into the image of God as revealed by the life of Jesus Christ" and focuses on the development of "knowledge, skills, and understandings to serve God and humanity."[25]

This brief survey does not do justice to the rich diversity of religious education in this country, but it shows the close connection that religious institutions draw between their central purpose and educating the young in the faith.

2

When we apply this understanding of the Religion Clauses to the cases now before us, it is apparent that Mor-rissey-Berru and Biel qualify for the exemption we recog-nized in *Hosanna-Tabor*.  There is abundant record evi-dence that they both performed vital religious duties. Educating and forming students in the Catholic faith lay at the core of the mission of the schools where they taught, and their employment agreements and faculty handbooks spec-ified in no uncertain terms that they were expected to help the schools carry out this mission and that their work would be evaluated to ensure that they were fulfilling that respon-sibility.  As elementary school teachers responsible for providing instruction in all subjects, including religion, they were the members of the school staff who were en-trusted most directly with the responsibility of educating their students in the faith.  And not only were they obli-gated to provide instruction about the Catholic faith, but they were also expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith.  They prayed with their students, attended

---

[24] Brief for General Conference of Seventh-day Adventists et al. as *Amici Curiae* 9.

[25] Seventh-day Adventist Church, About Us, https://adventisteducation. org/abt.html.

Mass with the students, and prepared the children for their participation in other religious activities. Their positions did not have all the attributes of Perich's. Their titles did not include the term "minister," and they had less formal religious training, but their core responsibilities as teachers of religion were essentially the same. And both their schools expressly saw them as playing a vital part in carrying out the mission of the church, and the schools' definition and explanation of their roles is important. In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition. A religious institution's explanation of the role of such employees in the life of the religion in question is important.

## III

In holding that Morrissey-Berru and Biel did not fall within the *Hosanna-Tabor* exception, the Ninth Circuit misunderstood our decision. Both panels treated the circumstances that we found relevant in that case as checklist items to be assessed and weighed against each other in every case, and the dissent does much the same. That approach is contrary to our admonition that we were not imposing any "rigid formula." 565 U. S., at 190. Instead, we called on courts to take all relevant circumstances into account and to determine whether each particular position implicated the fundamental purpose of the exception.[26]

_____

[26] The dissent charges that we transform the holding in *Hosanna-Tabor*, but that is what the dissent does. *Post,* at 8. According to the dissent: "*Hosanna-Tabor* charted a way to separate leaders who 'personify' a church's 'beliefs' [and] 'minister to the faithful' from individuals who may simply relay religious tenets." *Post,* at 7 (quoting 565 U. S., at 188, 195).

The dissent cobbles together this new test by taking phrases out of context from separate passages and inserting a proposition never suggested in *Hosanna-Tabor*, namely, that an individual cannot qualify for

The Ninth Circuit's rigid test produced a distorted analysis. First, it invested undue significance in the fact that Morrissey-Berru and Biel did not have clerical titles. 769 Fed. Appx., at 460; 911 F. 3d, at 608–609; *Post*, at 15–16. It is true that Perich's title included the term "minister," but we never said that her title (or her reference to herself as a "minister") was necessary to trigger the *Hosanna-Tabor* exception. Instead, "those considerations . . . merely made Perich's case an especially easy one." Brief for United States as *Amicus Curiae* 19. Moreover, both Morrissey-Berru and Biel had titles. They were Catholic elementary school *teachers*, which meant that they were their students' primary teachers of religion. The concept of a teacher of religion is loaded with religious significance. The term "rabbi" means teacher, and Jesus was frequently called rabbi.[27] And if a more esoteric title is needed, they were

_____

the exception if he or she "simply relay[s] religious tenets" without "'minister[ing] to the faithful.'" *Post*, at 7. *Hosanna-Tabor* never adopted this unworkable test. It did not suggest that the exception it recognized applied only to "leaders." *Post,* at 4–5, and n. 1. The term is never used in the opinion of the Court. Insisting on leadership as a qualification would shrink the exception even more than respondents advocate. For example, they agree that it should apply to nuns, see Brief for Respondents 21, but, under the dissent's test, is every cloistered nun—or every cloistered monk—disqualified? And even if leadership were a requirement, why couldn't a religious teacher be regarded as a leader of the students in the class?

Nor did our opinion in *Hosanna-Tabor* draw a critical distinction between a person who "simply relay[s] religious tenets" and one who relays such tenets while also "'minister[ing] to the faithful.'" *Post,* at 7. A teacher, such as an instructor in a class on world religions, who merely provides a description of the beliefs and practices of a religion without making any effort to inculcate those beliefs could not qualify for the exception, but otherwise the distinction makes no sense. If a member of the Christian clergy or a rabbi spends almost all of his or her time studying Scripture or theology and writing instead of ministering to a congregation, would that individual fall outside the exception as understood by the dissent?

[27] See, *e.g.*, Mark 9:5, 11:21; John 1:38, 3:26, 4:31, 6:25, 9:2.

both regarded as "catechists."[28]

Second, the Ninth Circuit assigned too much weight to the fact that Morrissey-Berru and Biel had less formal religious schooling than Perich. 769 Fed. Appx., at 460–461; 911 F. 3d, at 608; *post*, at 16–17. The significance of formal training must be evaluated in light of the age of the students taught and the judgment of a religious institution regarding the need for formal training. The schools in question here thought that Morrissey-Berru and Biel had a sufficient understanding of Catholicism to teach their students,[29] and judges have no warrant to second-guess that judgment or to impose their own credentialing requirements.

Third, the *St. James* panel inappropriately diminished the significance of Biel's duties because they did not evince "close guidance and involvement" in "students' spiritual lives." 911 F. 3d, at 609; *post*, at 12, 17–18. Specifically, the panel majority suggested that Biel merely taught "religion from a book required by the school," "joined" students in prayer, and accompanied students to Mass in order to keep them "'quiet and in their seats.'" 911 F. 3d, at 609. This misrepresents the record and its significance. For better or worse, many primary school teachers tie their instruction closely to textbooks, and many faith traditions prioritize teaching from authoritative texts. See Brief for InterVarsity Christian Fellowship USA et al. as *Amici Curiae* 26; Brief for Senator Mike Lee et al. as *Amici Curiae* 24–27. As for prayer, Biel prayed with her students, taught

———————

[28] See App. to Pet. for Cert. in No. 19–267, at 56a, 60a; ER 593 (St. James) ("teachers are expected to . . . engage in catechetical . . . development"); Record in No. 2:15–CV–04248 (CD Cal.), Doc. 67–1, ¶10 ("requir[ing]" attendance at "Catholic education conference" to "prepare teachers as religious educators").

[29] The record also makes clear (contrary to the Ninth Circuit's and dissent's conclusion, *post*, at 17) that Morrissey-Berru and Biel "held themselves out" as authorities on religion to their students, and, by extension, their families. See *supra*, at 2–9.

them prayers, and supervised the prayers led by students. She prepared them for Mass, accompanied them to Mass, and prayed with them there. See *supra*, at 8–9.

In Biel's appeal, the Ninth Circuit suggested that the *Hosanna-Tabor* exception should be interpreted narrowly because the ADA, 42 U. S. C. §12101 *et seq.*, and Title VII, §2000e–2, contain provisions allowing religious employers to give preference to members of a particular faith in employing individuals to do work connected with their activities. 911 F. 3d, at 611, n. 5; *post*, at 2–3. But the *Hosanna-Tabor* exception serves an entirely different purpose. Think of the quintessential case where a church wants to dismiss its minister for poor performance. The church's objection in that situation is not that the minister has gone over to some other faith but simply that the minister is failing to perform essential functions in a satisfactory manner.

While the Ninth Circuit treated the circumstances that we cited in *Hosanna-Tabor* as factors to be assessed and weighed in every case, respondents would make the governing test even more rigid. In their view, courts should begin by deciding whether the first three circumstances—a ministerial title, formal religious education, and the employee's self-description as a minister—are met and then, in order to check the conclusion suggested by those factors, ask whether the employee performed a religious function. Brief for Respondents 20–24. For reasons already explained, there is no basis for treating the circumstances we found relevant in *Hosanna-Tabor* in such a rigid manner.

Respondents go further astray in suggesting that an employee can never come within the *Hosanna-Tabor* exception unless the employee is a "practicing" member of the religion with which the employer is associated. Brief for Respondents 12–13, 21. In hiring a teacher to provide religious instruction, a religious school is very likely to try to select a person who meets this requirement, but insisting on this as a necessary condition would create a host of problems. As

pointed out by petitioners, determining whether a person is a "co-religionist" will not always be easy. See Reply Brief 14 ("Are Orthodox Jews and non-Orthodox Jews co-religionists? . . . Would Presbyterians and Baptists be similar enough? Southern Baptists and Primitive Baptists?"). Deciding such questions would risk judicial entanglement in religious issues.

Expanding the "co-religionist" requirement, Brief for Respondents 28–29, 44, to exclude those who no longer practice the faith would be even worse, *post*, at 13. Would the test depend on whether the person in question no longer considered himself or herself to be a member of a particular faith? Or would the test turn on whether the faith tradition in question still regarded the person as a member in some sense?

Respondents argue that Morrissey-Berru cannot fall within the *Hosanna-Tabor* exception because she said in connection with her lawsuit that she was not "a practicing Catholic," but acceptance of that argument would require courts to delve into the sensitive question of what it means to be a "practicing" member of a faith, and religious employers would be put in an impossible position. Morrissey-Berru's employment agreements required her to attest to "good standing" with the church. See App. 91, 144, 154. Beyond insisting on such an attestation, it is not clear how religious groups could monitor whether an employee is abiding by all religious obligations when away from the job. Was OLG supposed to interrogate Morrissey-Berru to confirm that she attended Mass every Sunday?

Respondents argue that the *Hosanna-Tabor* exception is not workable unless it is given a rigid structure, but we declined to adopt a "rigid formula" in *Hosanna-Tabor*, and the lower courts have been applying the exception for many years without such a formula. Here, as in *Hosanna-Tabor*, it is sufficient to decide the cases before us. When a school

with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow.

*    *    *

For these reasons, the judgment of the Court of Appeals in each case is reversed, and the cases are remanded for proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–267 and 19–348

_____

OUR LADY OF GUADALUPE SCHOOL, PETITIONER
19–267                        *v.*
AGNES MORRISSEY-BERRU


ST. JAMES SCHOOL, PETITIONER
19–348                        *v.*
DARRYL BIEL, AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF KRISTEN BIEL

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[July 8, 2020]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins,
concurring.

I agree with the Court that Morrissey-Berru's and Biel's
positions fall within the "ministerial exception,"[1] because,
as Catholic school teachers, they are charged with
"carry[ing] out [the religious] mission" of the parish schools.
*Ante*, at 21. The Court properly notes that "judges have no
warrant to second-guess [the schools'] judgment" of who
should hold such a position "or to impose their own creden-
tialing requirements." *Ante*, at 24. Accordingly, I join the
Court's opinion in full. I write separately, however, to reit-
erate my view that the Religion Clauses require civil courts

——————

[1] As the Court acknowledges, the term "ministerial exception" is some-
what of a misnomer. See *ante*, at 11. The First Amendment's protection
of religious organizations' employment decisions is not limited to mem-
bers of the clergy or others holding positions akin to that of a "minister."
*Ibid.* Rather, as these cases demonstrate, such protection extends to the
laity, provided they are entrusted with carrying out the religious mission
of the organization. *Ante*, at 2, 21.

to defer to religious organizations' good-faith claims that a certain employee's position is "ministerial." See *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 196 (2012) (THOMAS, J., concurring).

This deference is necessary because, as the Court rightly observes, judges lack the requisite "understanding and appreciation of the role played by every person who performs a particular role in every religious tradition." *Ante*, at 22. What qualifies as "ministerial" is an inherently theological question, and thus one that cannot be resolved by civil courts through legal analysis. See *Hosanna-Tabor*, *supra*, at 197 (THOMAS, J., concurring); see also Memorial and Remonstrance Against Religious Assessments, in Selected Writings of James Madison 21, 24 (R. Ketcham ed. 2006) (the idea that a "Civil Magistrate is a competent Judge of Religious truth" is "an arrogant pretension" that has been "falsified"). Contrary to the dissent's claim, judges do not shirk their judicial duty or provide a mere "rubber stamp" when they defer to a religious organization's sincere beliefs. *Post*, at 9 (opinion of SOTOMAYOR, J.). Rather, they heed the First Amendment, which "commands civil courts to decide [legal] disputes without resolving underlying controversies over religious doctrine." *Presbyterian Church in U. S.* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U. S. 440, 449 (1969); see also *ante,* at 16, n. 10.

Moreover, because the application of the exception turns on religious beliefs, the duties that a given religious organization will deem "ministerial" are sure to vary. Although the functions recognized as ministerial by the Lutheran school in *Hosanna-Tabor* are similar to those considered ministerial by the Catholic schools here, such overlap will not necessarily exist with other religious organizations, particularly those "outside of the 'mainstream.'" 565 U. S*.,* at 197 (THOMAS, J., concurring). To avoid disadvantaging these minority faiths and interfering in "a religious group's

right to shape its own faith and mission," *id.*, at 188 (majority opinion), courts should defer to a religious organization's sincere determination that a position is "ministerial." *Id.*, at 197 (THOMAS, J., concurring).

The Court's decision today is a step in the right direction. The Court properly declines to consider whether an employee shares the religious organization's beliefs when determining whether that employee's position falls within the "ministerial exception," explaining that to "determin[e] whether a person is a 'co-religionist' . . . would risk judicial entanglement in religious issues." *Ante*, at 26. But the same can be said about the broader inquiry whether an employee's position is "ministerial." This Court usually goes to great lengths to avoid governmental "entanglement" with religion, particularly in its Establishment Clause cases. See, *e.g.*, *Lemon* v. *Kurtzman*, 403 U. S. 602, 613 (1971).[2] For example, the Court has held that a public school became impermissibly "entangle[d]" with religion by simply *permitting* students to say a prayer before football games and overseeing a class election for whom would deliver the prayer. *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290, 305–307 (2000). And, in *Locke* v. *Davey*, 540 U. S. 712 (2004), the Court concluded that it would violate States' "antiestablishment interests" if tax dollars even indirectly supported the education of ministers, *id.*, at 722. But, when it comes to the autonomy of religious organizations in our ministerial-exception cases, these concerns of entanglement have not prevented the Court from weighing

————————

[2] As I have previously explained, this Court's Establishment Clause jurisprudence "is unmoored from the original meaning of the First Amendment." *Espinoza* v. *Montana Dept. of Revenue, ante*, at 2 (concurring opinion). Properly understood, the Establishment Clause proscribes governmental "'coercion of religious orthodoxy and of financial support by force of law and threat of penalty.'" *American Legion* v. *American Humanist Assn.*, 588 U. S. \_\_\_, \_\_\_ (2019) (THOMAS, J., concurring in judgment) (slip op., at 3) (quoting *Lee* v. *Weisman*, 505 U. S. 577, 640 (1992) (Scalia, J., dissenting)).

in on the theological questions of which positions qualify as
"ministerial."

   As this Court has explained, the Religion Clauses do not
permit governmental "interfere[nce] with . . . a religious
group's right to shape its own faith and mission through its
appointments." *Hosanna-Tabor*, *supra*, at 188. To avoid
such interference, we should defer to these groups' good-
faith understandings of which individuals are charged with
carrying out the organizations' religious missions.

   Here, the record confirms the sincerity of petitioners'
claims that, as lay teachers, Morrissey-Berru and Biel held
ministerial roles in these parish schools. For example, the
Our Lady of Guadalupe Faculty Handbook states that lay
teachers serve "special *pastoral* administrative roles . . . in
the service of the people of God." App. to Pet. for Cert. in
No. 19–267, p. 52a (emphasis added). Moreover, their "es-
sential job duties" include "[m]odeling, teaching of and com-
mitment to Catholic religious and moral values." *Id.*, at 55a
(boldface deleted); see also *id.*, at 32a (Morrissey-Berru's
teaching contract); App. to Pet. for Cert. in No. 19–348,
p. 96a (Biel's teaching contract). And both Morrissey-
Berru's and Biel's teaching contracts required that their
"duties and responsibilities . . . be performed [with an] over-
riding commitment" to "develop[ing] . . . a Catholic School
Faith Community" in accordance with "the doctrines, laws
and norms of the Catholic Church." *Ibid.*; App. to Pet. for
Cert. in No. 19–267, at 32a. Finally, *amicus curiae* United
States Conference of Catholic Bishops confirms that peti-
tioners' understanding is consistent with the Church's view
that "Catholic teachers play a critical role" in the Church's
ministry. Brief for United States Conference of Catholic
Bishops 10–11; see also Catechism of the Catholic Church
8 (2d ed. 2016) (noting that the goal of "education in the
faith of children [is] to initiat[e] the hearers into the full-
ness of Christian life" (emphasis deleted; internal quotation
marks omitted)).

THOMAS, J., concurring

The foregoing is more than enough to sustain the sincerity of petitioners' claims that Morrissey-Berru and Biel held ministerial roles in the parish schools. Their claims thus warrant this Court's deference and serve as a sufficient basis for applying the ministerial exception.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–267 and 19–348

_____

OUR LADY OF GUADALUPE SCHOOL, PETITIONER
19–267                   *v.*
AGNES MORRISSEY-BERRU


ST. JAMES SCHOOL, PETITIONER
19–348                   *v.*
DARRYL BIEL, AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF KRISTEN BIEL

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[July 8, 2020]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, dissenting.

Two employers fired their employees allegedly because one had breast cancer and the other was elderly. Purporting to rely on this Court's decision in *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171 (2012), the majority shields those employers from disability and age-discrimination claims. In the Court's view, because the employees taught short religion modules at Catholic elementary schools, they were "ministers" of the Catholic faith and thus could be fired for any reason, whether religious or nonreligious, benign or bigoted, without legal recourse. The Court reaches this result even though the teachers taught primarily secular subjects, lacked substantial religious titles and training, and were not even required to be Catholic. In foreclosing the teachers' claims, the Court skews the facts, ignores the applicable standard of review,

and collapses *Hosanna-Tabor*'s careful analysis into a single consideration: whether a church thinks its employees play an important religious role. Because that simplistic approach has no basis in law and strips thousands of schoolteachers of their legal protections, I respectfully dissent.

## I
## A

Our pluralistic society requires religious entities to abide by generally applicable laws. *E,g.*, *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 879–882 (1990). Consistent with the First Amendment (and over sincerely held religious objections), the Government may compel religious institutions to pay Social Security taxes for their employees, *United States* v. *Lee*, 455 U. S. 252, 256–261 (1982), deny nonprofit status to entities that discriminate because of race, *Bob Jones Univ.* v. *United States*, 461 U. S. 574, 603–605 (1983), require applicants for certain public benefits to register with Social Security numbers, *Bowen* v. *Roy*, 476 U. S. 693, 699–701 (1986), enforce child-labor protections, *Prince* v. *Massachusetts*, 321 U. S. 158, 166–170 (1944), and impose minimum-wage laws, *Tony and Susan Alamo Foundation* v. *Secretary of Labor*, 471 U. S. 290, 303–306 (1985).

Congress, however, has crafted exceptions to protect religious autonomy. Some antidiscrimination laws, like the Americans with Disabilities Act, permit a religious institution to consider religion when making employment decisions. 42 U. S. C. §12113(d)(1). Under that Act, a religious organization may also "require that all applicants and employees conform" to the entity's "religious tenets." §12113(d)(2). Title VII further permits a school to prefer "hir[ing] and employ[ing]" people "of a particular religion" if its curriculum "propagat[es]" that religion. §2000e–2(e); see also §2000e–1(a). These statutory exceptions protect a religious entity's ability to make employment decisions—

hiring or firing—for religious reasons.

The "ministerial exception," by contrast, is a judge-made doctrine. This Court first recognized it eight years ago in *Hosanna-Tabor*, concluding that the First Amendment categorically bars certain antidiscrimination suits by religious leaders against their religious employers. 565 U. S., at 188–190. When it applies, the exception is extraordinarily potent: It gives an employer free rein to discriminate because of race, sex, pregnancy, age, disability, or other traits protected by law when selecting or firing their "ministers," even when the discrimination is wholly unrelated to the employer's religious beliefs or practices. *Id.*, at 194–195. That is, an employer need not cite or possess a religious reason at all; the ministerial exception even condones animus.

When this Court adopted the ministerial exception, it affirmed the holdings of virtually every federal appellate court that had embraced the doctrine. *Id.*, at 188, and n. 2. Those courts had long understood that the exception's stark departure from antidiscrimination law is narrow. Wary of the exception's "potential for abuse," federal courts treaded "case-by-case" in determining which employees are ministers exposed to discrimination without recourse. *Scharon* v. *St. Luke's Episcopal Presbyterian Hospitals*, 929 F. 2d 360, 363, n. 3 (CA8 1991). Thus, their analysis typically trained on whether the putative minister was a "spiritual leade[r]" within a congregation such that "he or she should be considered clergy." *Rayburn* v. *General Conference of Seventh-day Adventists*, 772 F. 2d 1164, 1168–1169 (CA4 1985) (internal quotation marks omitted); see also *Hankins* v. *Lyght*, 441 F. 3d 96, 117–118, and n. 13 (CA2 2006) (Sotomayor, J., dissenting) (cataloging Circuit consensus). That approach recognized that a religious entity's ability to choose its faith leaders—rabbis, priests, nuns, imams, ministers, to name a few—should be free from government interference, but that generally applicable laws still protected most employees.

This focus on leadership led to a consistent conclusion: Lay faculty, even those who teach religion at church-affiliated schools, are not "ministers." In *Geary* v. *Visitation of Blessed Virgin Mary Parish School*, 7 F. 3d 324 (1993), for instance, the Third Circuit rejected a Catholic school's view that "[t]he unique and important role of the elementary school teacher in the Catholic education system" barred a teacher's discrimination claim under the First Amendment. *Id.*, at 331. In *Dole* v. *Shenandoah Baptist Church*, 899 F. 2d 1389 (1990), the Fourth Circuit found a materially similar statutory ministerial exception inapplicable to teachers who taught "all classes" "from a pervasively religious perspective," "le[d]" their "students in prayer," and were "required to subscribe to [a church] statement of faith as a condition of employment." *Id.*, at 1396. Similar examples abound. See, *e.g.*, *EEOC* v. *Mississippi College*, 626 F. 2d 477, 479, 485 (CA5 1980) (ministerial exception inapplicable to faculty members of a Baptist college that "conceive[d] of education as an integral part of its Christian mission" and "expected" faculty "to serve as exemplars of practicing Christians"); *EEOC* v. *Fremont Christian School*, 781 F. 2d 1362, 1369–1370 (CA9 1986) (ministerial exception inapplicable to teachers whom a church considered as performing "an integral part of the religious mission of the Church to its children"); cf. *Rayburn*, 772 F. 2d, at 1168 ("Lay ministries, even in leadership roles within a congregation, do not compare to the institutional selection for hire of one member with special theological training to lead others").

*Hosanna-Tabor* did not upset this consensus. Instead, it recognized the ministerial exception's roots in protecting religious "elections" for "ecclesiastical offices" and guarding the freedom to "select" titled "clergy" and churchwide leaders. 565 U. S., at 182, 184, 186–187 (internal quotation marks omitted). To be sure, the Court stated that the "ministerial exception is not limited to the head of a religious

congregation." *Id.*, at 190. Nevertheless, this Court explained that the exception applies to someone with a leadership role "distinct from that of most of [the organization's] members," someone in whom "[t]he members of a religious group put their faith," or someone who "personif[ies]" the organization's "beliefs" and "guide[s] it on its way." *Id.*, at 188, 191, 196.[1]

This analysis is context-specific. It necessarily turns on, among other things, the structure of the religious organization at issue. Put another way (and as the Court repeats throughout today's opinion), *Hosanna-Tabor* declined to adopt a "rigid formula for deciding when an employee qualifies as a minister." 565 U. S., at 190. Rather, *Hosanna-Tabor* focused on four "circumstances" to determine whether a fourth-grade teacher, Cheryl Perich, was employed at a Lutheran school as a "minister": (1) "the formal title given [her] by the Church," (2) "the substance reflected in that title," (3) "her own use of that title," and (4) "the important religious functions she performed for the Church." *Id.*, at 190, 192. Confirming that the ministerial exception applies to a circumscribed sub-category of faith leaders, the Court analyzed those four "factors," *ante*, at 16, to situate Perich as a minister within the Lutheran Church's structure.

## B

Those considerations showed that Perich had a unique leadership role within her church. First, the Court noted that the school had "held Perich out as a minister, with a role distinct from that of most of its members." 565 U. S.,

---

[1] While jettisoning most of *Hosanna-Tabor*'s majority opinion and insisting on "implicit" rationales that featured in a two-Justice concurrence, *ante*, at 18, today's Court curiously accuses this dissent of "cobb[ling] together" a standard focused on leadership, *ante*, at 22, n. 26. But leadership was central in *Hosanna-Tabor*, just as it was explicit in the appellate court consensus that *Hosanna-Tabor* embraced. See *supra,* at 3–4.

at 191.  When the school fired her, Perich was in the role of
a "called teacher," as opposed to her prior position of "lay
teacher."  *Id.*, at 178.  When the church "extended [Perich]
a call," it also "issued her a 'diploma of vocation' according
her the title 'Minister of Religion, Commissioned.'"  *Id*., at
191.  And "[i]n a supplement to the diploma, the congrega-
tion undertook to periodically review Perich's 'skills of min-
istry' and 'ministerial responsibilities,' and to provide for
her 'continuing education as a professional person in the
ministry of the Gospel.'"  *Ibid.*

Second, the Court observed that Perich's job title "re-
flected a significant degree of religious training followed by
a formal process of commissioning."  *Ibid.*  Further distin-
guishing Perich from the rest of her faith community, the
Court explained that Perich's "eligib[ility] to become a com-
missioned minister" turned on her completion of a six-year
process requiring "eight college-level courses in subjects in-
cluding biblical interpretation, church doctrine, and the
ministry of the Lutheran teacher," obtaining "the endorse-
ment of her local Synod district," and passing "an oral ex-
amination by a faculty committee at a Lutheran college."
*Ibid.*

Third, the Court observed that Perich "held herself out as
a minister of the Church by accepting the formal call to re-
ligious service" and "in other ways as well."  *Ibid.*  Unlike
the lay teachers, for example, Perich claimed a tax exemp-
tion available only to employees earning compensation "in
the exercise of the ministry."  *Id.*, at 192 (internal quotation
marks omitted).

Finally, the Court looked to function, finding that
Perich's "job duties reflected a role in conveying the
Church's message and carrying out its mission" notably dif-
ferent from other members of the church.  *Id.*, at 192; see
also *id.*, at 188, 191.  Perich was "expressly charged" with
"lead[ing] others" in their faith and did so by teaching "her
students religion four days a week" and "le[ading] them in

prayer three times a day." *Id.*, at 192 (internal quotation marks omitted). About twice a year, Perich led the school-wide chapel service by "choosing the liturgy, selecting the hymns, and delivering a short message based on verses from the Bible." *Ibid.* Perich also "led" her students "in a brief devotional exercise each morning." *Ibid.* The Court thus observed that, "[a]s a source of religious instruction, Perich performed an important role in transmitting the Lutheran faith to the next generation." *Ibid.*

Because this inquiry is holistic, the Court warned that it is "wrong" to "say that an employee's title does not matter." *Id.*, at 193. The Court was careful not to give religious functions undue weight in identifying church leaders. And the "amount of time an employee spends on particular activities," the Court added, "is relevant in assessing that employee's status" when measured against "the nature of the religious functions performed and the other considerations," like titles, training, and how the employee held herself out to the public. *Id.*, at 194.

*Hosanna-Tabor*'s well-rounded approach ensured that a church could not categorically disregard generally applicable antidiscrimination laws for nonreligious reasons. By analyzing objective and easily discernable markers like titles, training, and public-facing conduct, *Hosanna-Tabor* charted a way to separate leaders who "personify" a church's "beliefs" or who "minister to the faithful" from individuals who may simply relay religious tenets. *Id.,* at 188, 195.[2] This balanced First Amendment concerns of

_____

[2] Today's Court resists this commonsense approach, warning that it might mean that "a member of the Christian clergy or a rabbi" who "spends almost all of his or her time studying Scripture or theology and writing" would not fall within the ministerial exception. *Ante,* at 23, n. 26. Those examples betray the Court's holding: As the Court intuits (but does not recognize), the examples likely fall within the ministerial exception not just because of the functions involved but also because of

state-church entanglement while avoiding an overbroad
carve-out from employment protections.

## II

Until today, no court had held that the ministerial exception applies with disputed facts like these and lay teachers like respondents, let alone at the summary-judgment stage. See 911 F. 3d 603, 610 (CA9 2018) (case below in No. 19–348); see also *supra,* at 3–4.

Only by rewriting *Hosanna-Tabor* does the Court reach a different result. The Court starts with an unremarkable view: that *Hosanna-Tabor*'s "recognition of the significance of" the first three "factors" in that case "did not mean that they must be met—or even that they are necessarily important—in all other cases." *Ante*, at 16–17. True enough. One can easily imagine religions incomparable to those at issue in *Hosanna-Tabor* and here. But then the Court recasts *Hosanna-Tabor* itself: Apparently, the touchstone all along was a two-Justice concurrence. To that concurrence, "[w]hat matter[ed]" was "the religious function that [Perich] performed" and her "functional status." *Hosanna-Tabor*, 565 U. S., at 206 (opinion of ALITO, J.). Today's Court yields to the concurrence's view with identical rhetoric. "What matters," the Court echoes, "is what an employee does." *Ante*, at 18.

But this vague statement is no easier to comprehend today than it was when the Court declined to adopt it eight years ago. It certainly does not sound like a legal framework. Rather, the Court insists that a "religious institution's explanation of the role of [its] employees in the life of the religion in question is important." *Ante*, at 22; see also

---

the titles ("clergy" and "rabbi"), the training required to obtain those titles, and the time spent on religious activity ("almost all" of one's time). *Ibid.* It should be equally obvious that someone who spends a sliver of time reading, writing, or teaching about religion does not automatically become a minister of that religion.

*ante*, at 1–2 (THOMAS, J., concurring) (urging complete deference to a religious institution in determining which employees are exempt from antidiscrimination laws). But because the Court's new standard prizes a functional importance that it appears to deem churches in the best position to explain, one cannot help but conclude that the Court has just traded legal analysis for a rubber stamp.[3]

Indeed, the Court reasons that "judges cannot be expected to have a complete understanding and appreciation" of the law and facts in ministerial-exception cases, *ante*, at 22, and all but abandons judicial review. Although today's decision is limited to certain "teachers of religion," *ante,* at 22–23, its reasoning risks rendering almost every Catholic parishioner and parent in the Archdiocese of Los Angeles a Catholic minister.[4] That is, the Court's apparent deference here threatens to make nearly anyone whom the schools might hire "ministers" unprotected from discrimination in the hiring process. That cannot be right. Although certain

––––––––

[3] Elsewhere, the Court hints at a comparative inquiry, noting that Biel and Morrissey-Berru were the school staff "entrusted most directly" with "educating their students in the faith." *Ante*, at 21. Setting aside the Court's factual assumptions, one must ask: "[M]ost directly" compared to what (or whom)? The Court does not say. Perhaps the Court means to embrace the predominant circuit approach, which looked at whether a putative minister "serv[ed] primarily religious roles." *Hankins* v. *Lyght*, 441 F. 3d 96, 117, 118, n. 13 (CA2 2006) (Sotomayor, J., dissenting) (identifying seven Circuits); see also, *e.g.*, *Petruska* v. *Gannon University*, 462 F. 3d 294, 304, n. 6, 307 (CA3 2006). But were that the case, the teachers would have undoubtedly prevailed here.

[4] See, *e.g.*, Archdiocese of Los Angeles, Administrative Handbook §2.3.1 ("[P]arishioners are vital to parish life as volunteers. They participate as catechists in religious education, organize youth ministry and adult events, assist in charitable and social outreach activities in the community, and serve as extraordinary ministers of the Eucharist, lectors, altar servers, and ushers, as well as in other supporting ministerial roles"); Pope Francis, Post-Synodal Apostolic Exhortation on Love in the Family 13–14 (2015) ("The family is . . . the place where parents become their children's first teachers in the faith . . . . Parents have a serious responsibility for this work of education").

religious functions may be important to a church, a person's
performance of some of those functions does not mechani-
cally trigger a categorical exemption from generally appli-
cable antidiscrimination laws.

Today's decision thus invites the "potential for abuse"
against which circuit courts have long warned. *Scharon*,
929 F. 2d, at 363, n. 3. Nevermind that the Court renders
almost all of the Court's opinion in *Hosanna-Tabor* irrele-
vant. It risks allowing employers to decide for themselves
whether discrimination is actionable. Indeed, today's deci-
sion reframes the ministerial exception as broadly as it can,
without regard to the statutory exceptions tailored to pro-
tect religious practice. As a result, the Court absolves reli-
gious institutions of any animus completely irrelevant to
their religious beliefs or practices and all but forbids courts
to inquire further about whether the employee is in fact a
leader of the religion. Nothing in *Hosanna-Tabor* (or at
least its majority opinion) condones such judicial abdica-
tion.

## III

Faithfully applying *Hosanna-Tabor*'s approach and com-
mon sense confirms that the teachers here are not Catholic
"ministers" as a matter of law. This is especially so because
the employers seek summary judgment, meaning the Court
must "view the facts and draw reasonable inferences in the
light most favorable to" the teachers. *Scott* v. *Harris*, 550
U. S. 372, 378 (2007) (internal quotation marks omitted).[5]

_____

[5] The Court maintains that the Court of Appeals erred by "in effect"
granting summary judgment to the teachers on the ministerial exception
instead of "remand[ing] for a trial." *Ante,* at 3, n. 1. Yet today's decision
commits the exact error it claims to diagnose: The Court views the facts
in the light most favorable to the schools and "in effect" grants summary
judgment to the movants instead of remanding for a trial. As explained
below, the Court is also wrong to assert that there is no material fact
genuinely in dispute. Compare *ibid.* (asserting that "neither party takes

## A

### 1

Respondent Kristen Biel was a teacher at St. James School, a Catholic school in the Archdiocese of Los Angeles.[6] Biel initially served as a substitute teacher, teaching first grade two days a week. App. 248–249. At the end of the 2013 school year, the school hired Biel as a full-time fifth-grade teacher. 911 F. 3d, at 605; App. 250.

Biel's employment contract identified her position as just that: "Grade 5 Teacher." App. to Pet. for Cert. in No. 19–348, p. 103a; App. 328–329. The contract referred to Biel throughout as "teacher," and directed her to the benefits guide for "Lay Employees." App. to Pet. for Cert. in No. 19–348, at 105a; App. 320, 325, 327–329. The contract also stated that Biel would work "within [St. James's] overriding commitment" to church "doctrines, laws, and norms" and would "model, teach, and promote behavior in conformity to the teaching of the Roman Catholic Church." 911 F. 3d, at 605 (internal quotation marks omitted). According to the faculty handbook, all faculty (religion teachers or not) "participate in the Church's mission" of providing "quality Catholic education to . . . students, educating them in academic areas and in . . . Catholic faith and values." *Id.*, at 605–606 (internal quotation marks omitted). The faculty handbook further instructs teachers to follow California's public-school curricular requirements. *Id.*, at 606.

Although St. James School "recommended" that teachers be Catholic, the school did not require it. App. 289. Nor did the school require teachers to have experience, training, or

———————

the position that any *material* fact is genuinely in dispute) with, *e.g.,* Brief for Respondents 12–13, n. 4, 40–41 (taking the position that material facts are genuinely in dispute).

[6] Unlike the Court, I begin with Biel's case because it was the first one decided and the only one deemed precedential below. Biel passed away last year, losing her life to the same cancer that allegedly lost her a job at St. James. Biel's husband now represents her estate.

schooling in religious pedagogy.  911 F. 3d, at 605.  Biel had
no such credentials when the school hired her, as she had
received her bachelor's degree in liberal arts and a teaching
credential from a public university.  *Ibid.*  Even after she
began working at St. James School, Biel's "only" training in
religious pedagogy was "a single half-day conference where
topics ranged from the incorporation of religious themes
into lesson plans to techniques for teaching art classes."
*Ibid.*; see also App. 242–244, 261–263.

Biel taught her fifth-grade class all its academic subjects,
including English, spelling, reading, literature, mathemat-
ics, science, and social studies.  911 F. 3d, at 605; Excerpts
of Record in No. 17–55180 (CA9), p. 588.  This also involved
a standard religion curriculum, which Biel taught for about
30 minutes four days a week.  911 F. 3d, at 605.  When
teaching religion, Biel followed instructions in a workbook
that the school administration had prescribed.  *Ibid.*; App.
254–255.  Twice a day, Biel would pray with her students,
but she "did not lead them."  911 F. 3d, at 605.  Rather, the
class had student "prayer leaders" and "[t]he prayers that
were said in the classroom were said mostly by the stu-
dents."  App to Pet. for Cert. in No. 19–348, at 93a.  As Biel
explained, she "didn't need to teach" her students any pray-
ers, either, because "[t]hey already kn[e]w them" and "had
prayer leaders."  *Ibid.*; contra, *ante*, at 24–25 (asserting
without citation that Biel "taught [her students] prayers").
Once a month, Biel joined her students in the school's mul-
tipurpose room for mass, which were always officiated by a
Catholic priest or a nun.  App. 258.  The record does not
show that Biel taught her students what to do at mass.
*Ibid.*  Rather, Biel's "sole responsibility" during liturgy was
"to keep her class quiet and orderly."  911 F. 3d, at 605; App.
258–259.

Near the end of the school year, Biel learned that she had
breast cancer and would need surgery and chemotherapy.
Biel informed the school and explained that her condition

would require her to take time off from work. 911 F. 3d, at
606; App. 266–269, 309. The school responded that she
would not be welcomed back. 911 F. 3d, at 606; App. 270–
273. At no point has St. James School suggested a religious
reason for terminating Biel's employment.

2

In 1998, after a 20-year career in newspaper advertising
and copywriting, respondent Agnes Deirdre Morrissey-
Berru began working as a substitute teacher at Our Lady
of Guadalupe School, another Catholic school in Southern
California. App. to Pet. for Cert. in No. 19–267, p. 80a; App.
74. More recently, she taught fifth and sixth grade full
time. App. 73–75.

Each year, Morrissey-Berru signed an employment con-
tract with the school. Like Biel's contracts, these agree-
ments referred to Morrissey-Berru as "Teacher" and di-
rected her to the benefits guide for "Lay Employees."
App. 91–100, 127–164; App. to Pet. for Cert. in No. 19–267,
at 32a–42a. Notably, the faculty handbook promised not to
discriminate on the basis of any protected characteristic, in-
cluding "race," "sex," "disability," or "age." Record Excerpts
in No. 17–56624, p. 648.

"At no time" during her employment did Morrissey-Berru
"feel God was leading [her] to serve in the ministry," nor did
she "believe [she] was accepting a formal . . . call to religious
service by working at Our Lady of Guadalupe as a fifth and
sixth grade teacher." App. to Brief in Opposition in No. 19–
267, p. 2a. Morrissey-Berru, in fact, is not a practicing
Catholic. *Ibid.* Although Our Lady of Guadalupe School
"preferred" its teachers to be Catholic, there is a factual dis-
pute whether the school insisted on that prerequisite with-
out exception (and thus, for summary-judgment purposes,
the Court must assume there was no absolute require-
ment). App. 110–111; *Scott*, 550 U. S., at 378. Nor did the
school require teachers to have any background or training

in Catholic pedagogy (or even religion). Morrissey-Berru had no such credentials when the school hired her, as she held a bachelor's degree in English language arts with a minor in secondary education. App. 73–74. Many years after Morrissey-Berru had begun teaching at the school, though, the school did ask her to attend a catechist course on the history of the Catholic Church. 769 Fed. Appx. 460, 461 (CA9 2019) (*per curiam*) (opinion below in No. 19–267); App. to Pet. for Cert. in No. 19–267, at 85a. The record does not disclose whether Morrissey-Berru ever completed the full catechism-certification program, and in fact suggests that she did not. *E.g.*, Excerpts of Record in No. 17–56624 (CA9), pp. 41–42, 44–45, 67.

Morrissey-Berru taught her class a range of subjects: reading, writing, math, grammar, vocabulary, science, social studies, and religion. App. 75. When teaching religion, Morrissey-Berru followed the contents of a preselected workbook. App. 79–80. Morrissey-Berru also "led her students in daily prayer" and assisted with planning a monthly mass. 769 Fed. Appx., at 461. But she did not recall "lead[ing her] students in any devotional exercises." App. to Pet. for Cert. in No. 19–267, at 89a.

In 2014, when Morrissey-Berru was in her sixties, the school did not renew Morrissey-Berru's contract. *Id.*, at 30a–31a. Like St. James, Our Lady of Guadalupe School has neither cited nor asserted a religious reason for the termination.

## B

On these records, the Ninth Circuit correctly concluded that neither school had shown that the ministerial exception barred the teachers' claims for disability and age discrimination. At the very least, these cases should have proceeded to trial. Viewed in the light most favorable to the teachers, the facts do not entitle the employers to summary judgment.

First, and as the Ninth Circuit explained, neither school publicly represented that either teacher was a Catholic spiritual leader or "minister." Neither conferred a title reflecting such a position. Rather, the schools referred to both Biel and Morrissey-Berru as "lay" teachers, which the circuit courts have long recognized as a mark of nonministerial, as opposed to "ministerial," status. See *supra*, at 3–4; App. to Pet. for Cert. in No. 19–267, at 32a–42a; App. 91–100, 127–164, 244–46, 320–329.

In response, the Court worries that "attaching too much significance to titles would risk privileging religious traditions with formal organizational structures over those that are less formal." *Ante*, at 17. That may or may not be true, but it is irrelevant here. These cases are not about "less formal" religions; they are about the Catholic Church and its publicized and undisputedly "formal organizational structur[e]." *Ibid.* After all, the right to free exercise has historically "allow[ed] churches and other religious institutions to define" their own "membership" and internal "organization." McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1464–1465 (1990). But that freedom of choice should carry consequences in litigation. And here, like the faith at issue in *Hosanna-Tabor*, the Catholic Church uses formal titles.

The Court then turns to irrelevant or disputed facts. The Court notes, for example, that a religiously significant term "rabbi" translates to "teacher," *ante*, at 23, suggesting that Biel's and Morrissey-Berru's positions as lay teachers conferred religious titles after all. But that wordplay unravels when one imagines the Court's logic as applied to a math or gym or computer "teacher" at either school. The title "teacher" does not convey ministerial status. Nor does the Court gain purchase from the disputed fact that Biel and Morrissey-Berru were "regarded as 'catechists'" "'responsible for the faith formation of the[ir] students.'" *Ante*, at 4,

24. For one thing, the Court discusses evidence from only Morrissey-Berru's case (not Biel's).[7]  For another, the Court invokes the disputed deposition testimony of a school administrator while ignoring record evidence refuting that characterization and suggesting that Morrissey-Berru never completed the full catechist training program.  See, *e.g.*, Excerpts of Record in No. 17–56624 (CA9), at 41–42, 44–45, 67.  Although the Archdiocese does confer titles and holds a formal "Catechist Commissioning" every September, *id.*, at 42, 45, the record does not suggest that either teacher here was so commissioned.  In relying on disputed factual assertions, the Court's blinkered approach completely disregards the summary-judgment standard.

Second (and further undermining the schools' claims), neither teacher had a "significant degree of religious training" or underwent a "formal process of commissioning." *Hosanna-Tabor*, 565 U. S., at 191; cf. Excerpts of Record in No. 17–56624 (CA9), at 42 (identifying similarly formal training and commissioning process within the Catholic Church).  Nor did either school require such training or commissioning as a prerequisite to gaining (or keeping) employment.  In Biel's case, the record reflects that she attended a single conference that lasted "four or five hours," briefly discussed "how to incorporate God into . . . lesson plans," and otherwise "showed [teachers] how to do art and make little pictures or things like that." App. 262.  Notably, all elementary school faculty attended the conference, including the computer teacher. *Id.*, at 261–263.  In turn, Our Lady of Guadalupe did not ask Morrissey-Berru to undergo

---

[7] In Biel's case, the Court cites a page from St. James School's "Staff Guidelines and Responsibilities" setting out "'expect[ations]'" and a declaration by the school principal about required attendance at a teacher conference.  See *ante*, at 24, n. 28.  Neither shows as a matter of law that Biel was a "catechist" or that formal religious training was a prerequisite to her position.  See *infra*, this page and 17.

any religious training for her first 13 years of teaching, until it asked her to attend the uncompleted program described above. See *id.*, at 76–77. This consideration instructs that the teachers here did not fall within the ministerial exception.

Third, neither Biel nor Morrissey-Berru held herself out as having a leadership role in the faith community. Neither claimed any benefits (tax, governmental, ceremonial, or administrative) available only to spiritual leaders. Cf. *Hosanna-Tabor*, 565 U. S., at 191–192. Nor does it matter that all teachers signed contracts agreeing to model and impart Catholic values. This component of the *Hosanna-Tabor* inquiry focuses on outward-facing behavior, and neither Biel nor Morrissey-Berru publicly represented herself as anything more than a fifth-grade teacher. App. to Brief in Opposition in No. 19–267, at 1a–2a; App. 249–250. The Court does not grapple with this third component of *Hosanna-Tabor*'s inquiry, which seriously undermines the schools' cases.

That leaves only the fourth consideration in *Hosanna-Tabor*: the teachers' function. To be sure, Biel and Morrissey-Berru taught religion for a part of some days in the week. But that should not transform them automatically into ministers who "guide" the faith "on its way." *Hosanna-Tabor*, 565 U. S., at 196; see also *supra,* at 3–4. Although the Court does not resolve this functional question with "a stopwatch," it still considers the "amount of time an employee spends on particular activities" in "assessing that employee's status." *Hosanna-Tabor*, 565 U. S., at 193–194. Here, the time Biel and Morrissey-Berru spent on secular instruction far surpassed their time teaching religion. For the vast majority of class, they taught subjects like reading, writing, spelling, grammar, vocabulary, math, science, social studies, and geography. In so doing, both were like any public school teacher in California, subject to the same statewide curriculum guidelines. 911 F. 3d, at 606. In

other words, both Biel and Morrissey-Berru had almost ex-
clusively secular duties, making it especially improper to
deprive them of all legal protection when their employers
have not offered any religious reason for the alleged dis-
crimination.

Nor is it dispositive that both teachers prayed with their
students. Biel did not lead devotionals in her classroom,
did not teach prayers, and had a minor role in monitoring
student behavior during a once-a-month mass. App. 79,
252–253, 256–259. Morrissey-Berru did lead classroom
prayers, bring her students to a cathedral once a year, di-
rect the school Easter play, and sign a contract directing
her to "assist with Liturgy Planning." App. to Pet. for Cert.
in No. 19–267, at 42a, 68a–69a, 95a–96a. But these occa-
sional tasks should not trigger as a matter of law the min-
isterial exception. Morrissey-Berru did not lead mass, de-
liver sermons, or select hymns. *Id.*, at 89a. And unlike the
teacher in *Hosanna-Tabor*, there is no evidence that Mor-
rissey-Berru led devotional exercises. App. to Pet. for Cert.
in No. 19–267, at 89a. Her limited religious role does not
fit *Hosanna-Tabor*'s description of a "minister to the faith-
ful." 565 U. S., at 189.

Nevertheless, the Court insists that the teachers are min-
isters because "implicit in our decision in *Hosanna-Tabor*
was a recognition that educating young people in their
faith, inculcating its teachings, and training them to live
their faith are responsibilities that lie at the very core of the
mission of a private religious school." *Ante*, at 18. But
teaching religion in school alone cannot dictate ministerial
status. If it did, then *Hosanna-Tabor* wasted precious
pages discussing titles, training, and other objective indicia
to examine whether Cheryl Perich was a minister. Not sur-
prisingly, the Government made this same point earlier in
Biel's case: "If teaching religion to elementary school stu-
dents for a half-hour each day, praying with them daily, and
accompanying them to weekly or monthly religious services

were sufficient to establish a teacher as a minister of the church within the meaning of the ministerial exception, the Supreme Court would have had no need for most of its discussion in *Hosanna-Tabor*." Brief for EEOC as *Amicus Curiae* in No. 17–55180 (CA9), p. 21. Rather, "the Court made clear in *Hosanna-Tabor* that context matters." *Ibid.* Indeed.[8]

Were there any doubt left about the proper result here, recall that neither school has shown that it required its religion teachers to be Catholic. The Court does not explain how the schools here can show, or have shown, that a non-Catholic "personif[ies]" Catholicism or leads the faith. *Hosanna-Tabor*, 565 U. S., at 188. Instead, the Court remarks that a "rigid" coreligionist requirement might "not always be easy" to apply to faiths like Judaism or variations of Protestantism. *Ante*, at 25–26. Perhaps. But that has nothing to do with Catholicism.

Pause, for a moment, on the Court's conclusion: Even if the teachers were not Catholic, and even if they were forbidden to participate in the church's sacramental worship, they would nonetheless be "ministers" of the Catholic faith simply because of their supervisory role over students in a religious school. That stretches the law and logic past their breaking points. (Indeed, it is ironic that Our Lady of Guadalupe School seeks complete immunity for age discrimination when its teacher handbook promised not to discriminate on that basis.) As the Government once put it, even when a school has a "pervasively religious atmosphere," its faculty are unlikely ministers when "there is no requirement that its teachers even be members of [its] religious denomination." Brief for Appellee in No. 84–2779 (CA9

_____

[8] Although the Government supported Biel below, it has since switched sides without explanation. Odder still, the Government's brief to this Court faults the Ninth Circuit for having embraced the Government's prior views. Compare Brief for EEOC as *Amicus Curiae* in No. 17–55180 (CA9), p. 21, with Brief for United States as *Amicus Curiae* 16–17.

1986), pp. 11, 29, n. 17.  It is hard to imagine a more con-
crete example than these cases.

\*      \*      \*

The Court's conclusion portends grave consequences.  As
the Government (arguing for Biel at the time) explained to
the Ninth Circuit, "thousands of Catholic teachers" may
lose employment-law protections because of today's out-
come.  Recording of Oral Arg. 25:15–25:30 in No. 17–55180
(July    11,    2018),    https://www.ca9.uscourts.gov/media/
view_video.php?pk_vid=0000014022.    Other sources tally
over a hundred thousand secular teachers whose rights are
at risk.  See, *e.g.*, Brief for Virginia et al. as *Amici Curiae*
33, n. 25.  And that says nothing of the rights of countless
coaches, camp counselors, nurses, social-service workers,
in-house lawyers, media-relations personnel, and many
others who work for religious institutions.  All these em-
ployees could be subject to discrimination for reasons com-
pletely irrelevant to their employers' religious tenets.

In expanding the ministerial exception far beyond its his-
toric narrowness, the Court overrides Congress' carefully
tailored exceptions for religious employers.  Little if nothing
appears left of the statutory exemptions after today's con-
stitutional broadside.  So long as the employer determines
that an employee's "duties" are "vital" to "carrying out the
mission of the church," *ante*, at 21–22, then today's laissez-
faire analysis appears to allow that employer to make em-
ployment decisions because of a person's skin color, age, dis-
ability, sex, or any other protected trait for reasons having
nothing to do with religion.

This sweeping result is profoundly unfair.  The Court is
not only wrong on the facts, but its error also risks upending
antidiscrimination protections for many employees of reli-
gious entities.  Recently, this Court has lamented a per-
ceived "discrimination against religion."  *E.g.*, *Espinoza* v.
*Montana Dept. of Revenue*, *ante*, at 12.  Yet here it swings

the pendulum in the extreme opposite direction, permitting religious entities to discriminate widely and with impunity for reasons wholly divorced from religious beliefs. The inherent injustice in the Court's conclusion will be impossible to ignore for long, particularly in a pluralistic society like ours. One must hope that a decision deft enough to remold *Hosanna-Tabor* to fit the result reached today reflects the Court's capacity to cabin the consequences tomorrow.

I respectfully dissent.