Filed 4/28/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| FRANCES ATKINS, | B314220 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV02947) |
| v. | |
| ST. CECILIA CATHOLIC SCHOOL, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert S. Draper, Judge. Reversed and remanded with directions.

Eisenberg & Associates, Michael B. Eisenberg, Daniel Nomanim; and Joseph S. Socher for Plaintiff and Appellant.

Gordon Rees Scully Mansukhani, Debra E. Meppen, Anthony J. Bellone and Christopher R. Wagner for Defendant and Respondent.

_____

# INTRODUCTION

Appellant Frances Atkins was a long-term employee of respondent St. Cecilia Catholic School. In her final year of employment, Atkins worked part-time as an art teacher and office administrator. Following her discharge, Atkins filed this action against St. Cecilia for age discrimination in violation of the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) The trial court granted St. Cecilia's motion for summary judgment on the ground that Atkins's suit was barred by the ministerial exception, a constitutional doctrine that precludes certain employment claims brought against a religious institution by its ministers. We conclude there are triable issues of material fact as to whether the ministerial exception applies in this case. We therefore reverse the judgment in favor of St. Cecilia and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

## I. St. Cecilia's philosophy and mission

St. Cecilia is a Catholic elementary school within the Archdiocese of Los Angeles (ADLA). The mission of the ADLA "encompasses the belief of continuing the redemptive work of Jesus Christ, living and proclaiming the gospel, and being faithful stewards of God's creation." The ADLA's mission also involves "carry[ing] the message of [the Catholic] faith and the Gospel . . . to those who are waiting to hear God's word in the workplaces and parishes." The ADLA dedicates its parish communities and schools to fulfilling this mission.

St. Cecilia offers a faith-based education to students from transitional kindergarten through eighth grade. The school's philosophy "is centered in the Gospel teaching of Jesus Christ[,]

integrating the Gospel message in its curriculum to provide students with an opportunity [to] experience a Catholic Faith Community." In accordance with this philosophy, St. Cecilia's mission provides: " 'Accepting the call to teach as Jesus taught, we offer a quality Catholic education in a secure, stable, and nurturing faith community that affirms the uniqueness and dignity of each student and encourages all to live the Gospel message of Jesus Christ.' "

## II.   Atkins's employment with St. Cecilia

Atkins was employed by St. Cecilia for approximately 40 years from 1978 to 2018. When she first started at the school, Atkins worked as a part-time secretary or office administrator. Her job duties included answering phones, filing, photocopying, maintaining student records, processing student registrations, communicating with parents, and doing "[w]hatever [was] needed to make the office run smoothly." Atkins occupied this role until her employment was terminated at the end of the 2017 to 2018 academic year.

In 1999, Atkins began working as a part-time art teacher at the school in addition to performing her office administration duties. In this role, Atkins taught studio art and art history to students from kindergarten through eighth grade. She also would serve as a substitute teacher in other subjects from time to time. Throughout her tenure at St. Cecilia, Atkins was the school's only art teacher.

In 2012, Atkins completed and signed a job application for a "non-teaching staff" position at St. Cecilia. According to Atkins, the application was for a position as an office manager or administrator. In the application, Atkins checked a box indicating that she was "willing to maintain, by word and actions,

3

a position of role model and witness to the Gospel of Christ that is in conformity with the teachings, standards, doctrines, laws, and norms of the Roman Catholic Church as interpreted by the [ADLA]." In connection with the application, Atkins also signed a three-page job description. In addition to setting forth a number of non-religious, secretarial-related duties, the job description stated that the position required "[o]ne who actively supports and is expected to conduct themselves in accordance with the philosophy and mission of the Church/School while performing their work."[1]

During her final year of employment, Atkins worked part-time at St. Cecilia three days a week as an office administrator and an art teacher. Her work hours were Mondays from 7:30 a.m. to 11:30 a.m., Wednesdays from 7:30 a.m. to 4:30 p.m., and Fridays from 11:30 a.m. to 3:30 p.m. Atkins taught art on Mondays and worked in the office on Fridays. She performed both roles on Wednesdays, teaching art from 7:30 a.m. to 2:00 p.m., and then working in the office until 4:30 p.m. While Atkins was identified as an art teacher in the budget for the 2017 to 2018 academic year, her job title on the school's website was listed as office secretary and never changed.

Atkins was familiar with the ADLA's Administrative Handbook, including its policy pertaining to "catechesis." According to that handbook, the "overall philosophy" of the ADLA is centered on "catechesis," which "is accomplished by varied, interconnected tasks that are inspired by Jesus'[s] example in

---

[1] The record does not disclose why Atkins applied for an office administration position in 2012 when she had already been working in this role at St. Cecilia for a number of years.

4

forming his disciples." The six tasks of catechesis are to: (1) "Promote knowledge of the faith," (2) "Promote knowledge of the meaning of the liturgy and sacraments," (3) "Promote moral formation in Jesus Christ," (4) "Teach the Christian how to pray with Christ," (5) "Prepare the Christian to live in community and to participate actively in the life and mission of the church," and (6) "Promote a missionary spirit that prepares the faithful to be present as Christians in society." The handbook provides that these tasks "are imparted through individual relationships, the community of faith, the liturgy, instruction, experiential learning, ritual, prayer, and outreach to the global community."

At her deposition, Atkins was shown a copy of the tasks of catechesis as set forth in the ADLA's Administrative Handbook, and was asked if she understood that she was to perform her job duties at St. Cecilia in a manner consistent with these tasks. In response, Atkins testified: "Whatever the subject was that I was either substituting or I was teaching with visual art is what . . . how I would teach. [¶] At the schools that I worked at, we also had religion, which was taught by a separate teacher, so it would cover all of these things. [¶] And, basically, I would make sure or promote the understanding of these when we are in the class. [¶] . . . I didn't teach [this] doctrine because they were getting it already when they had their religion class. I just made sure it was upheld that they did Christ-like things whatever they needed to be done. If their behavior was not Christ-like, I would say it's not Christ-like."

Atkins also understood that, as a Catholic school, "St. Cecilia was promoting and developing the Catholic faith." When asked if she incorporated any sort of Catholic faith into her curriculum as an art teacher, Atkins answered: "We practiced

5

[the] Catholic faith every day we came into the class."
Referencing the six tasks of catechesis in the ADLA's
Administrative Handbook, Atkins then elaborated: "That
mean[s], they would be Christ-like. If you read your document
over here, where it says handbook, the things we had to do,
acknowledging their faith, we prayed. Promote the meaning of
the liturgy and the sacraments, that was taught in Religion. [¶]
But if there was something we were doing in the class, we would
talk about that and go over the information that was received
from the Religion class. Perform moral formation in Jesus
Christ, talked always about Jesus is the way to go. Jesus.
Follow him, don't follow man. Prepare the Christian to live in the
community to participa[te] actively in the life and the mission of
the church. [¶] Christ is first. You['re] going to live your life
Christ-like. You're going to have here . . . in the community,
which means to give back. Don't just be selfish and keep
everything for yourself. Help others, even if you didn't do it, and
you see something needs to be done, like the commercial, help the
little lady across the street. That was being taught in the class."

In describing her job duties as an art teacher, Atkins stated
that the students "would learn about artists" and "the language
of art." They then would create different art projects based on
their study of different artists, and "come up with their own
interpretation of subjects such as Kandinsky." With respect to
religious-themed projects, the students would make Christmas
holiday cards to give to their parents. Although the cards
included art depicting the nativity scene, Atkins did not teach the
students about the religious aspects of the nativity scene or
Christmas. When asked if she included any religious
methodology in her teaching, Atkins replied: "If we were talking

6

about an artist that had information about methodology for religion, yes." According to Atkins, however, "[t]his was not limited to any particular religion, but rather focused on how religion might have affected a particular artist's work."

Atkins maintained certain Catholic symbols on the walls of her classroom at St. Cecilia, including a crucifix and a poster that advised students "to live Christ-like" and according to "Christian morals." These religious symbols had been placed in the classroom by school administration. Atkins did not incorporate prayer into her teaching. She testified, however, that if she had students in her art class for the last period of the day, "we would ask for traveling mercies from Jesus so that they could get home safely." She also explained that, while she did not conduct a daily prayer with her students, "we would pray, read an Our Father or Hail Mary" if she had a class at the end of the day because the students would not be returning to class but rather going home.

Atkins does not consider herself to be Catholic. Instead, she identifies as a nondenominational Christian. She does not have any formal religious education, and she was not required to take any religious courses as part of her employment at St. Cecilia. In her role as both an office administrator and an art teacher at the school, Atkins did not teach or preach Catholicism or the Gospel. She was not expected to instruct students about Jesus or the Bible, or to attend any prayer services. Although Atkins would pray of her own accord in her daily life, her decision to do so was unrelated to her job duties at St. Cecilia.

### III. Atkins's termination of employment

In 2017, about a year before Atkins was discharged, Azarel Moreno was hired to work in the office as a secretary. Moreno

was younger than Atkins, and Atkins helped train her for the position.  Norma Guzman, who was St. Cecilia's principal at the time, made the hiring decision.  According to Guzman, when she hired Moreno, Atkins was listed in the budget as an art teacher.  If, however, there had not been room in the budget for an art teacher, Guzman still would have retained Atkins and returned her to the same office duties and work schedule that she had before.

In the summer of 2018, Patrick Kelly became St. Cecilia's new principal.  Kelly had been told that Atkins previously was the school's secretary, but had transitioned out of that position and was currently the fine arts teacher.  Shortly after joining St. Cecilia, Kelly met with Atkins to discuss her position and availability for the upcoming school year.  According to Atkins, she told Kelly that she taught art and also worked in office administration.  At one point during the meeting, Kelly commented to Atkins, "You need to slow down.  You're doing too much."

About a week after the meeting, Kelly decided that St. Cecilia could no longer afford a fine arts teacher, and that the position should be eliminated.  In making the decision to eliminate Atkins's teaching position, Kelly did not offer her the opportunity to continue working at the school in an office administration position.  Instead, Kelly decided not to have Atkins return to St. Cecilia in any capacity for the 2018 to 2019 academic year.  Following Atkins's discharge, Moreno took over all of the office administration duties that Atkins had performed for the school.

## IV. Atkins's lawsuit against St. Cecilia

On January 28, 2019, Atkins filed this action against St. Cecilia and the Roman Catholic Archbishop of Los Angeles, alleging causes of action for age discrimination in violation of FEHA, and failure to provide personnel records in violation of Labor Code sections 226 and 1198.5. Atkins later dismissed the Archbishop of Los Angeles as a named defendant, and dismissed the cause of action for violation of the Labor Code. The gravamen of Atkins's complaint was that St. Cecilia discharged her because of her age and replaced her with a significantly younger and less experienced employee. On May 1, 2019, St. Cecilia filed an answer to the operative complaint, but did not assert the ministerial exception as an affirmative defense in its answer.

The case originally was set for trial in May 2020. In March 2020, the parties stipulated to continue the trial date and the discovery cutoff dates due to the COVID-19 pandemic. The parties did not, however, agree to extend the deadline for filing a motion for summary judgment, which had already passed. On March 18, 2020, the trial court approved this stipulation and continued the trial to September 2020. In July 2020, the parties again stipulated to continue the trial date, but not to extend the discovery cutoff dates subject to certain limited exceptions. On July 22, 2020, the trial court approved this second stipulation and continued the trial to June 2021.

On November 13, 2020, St. Cecilia filed a motion to set aside the March 18, 2020 scheduling order so that it could file a motion for summary judgment. St. Cecilia argued that, due to a recent change in decisional law, it now had grounds to seek summary judgment based on the ministerial exception. Atkins opposed the motion to set aside on several grounds, including

9

that the parties explicitly had agreed in their prior stipulation not to extend the summary judgment deadline, and that the ministerial exception did not apply to Atkins as a former secular employee of the school. Atkins also asserted that if St. Cecilia were permitted to file a summary judgment motion based on the ministerial exception, Atkins should be allowed to take further depositions at the school's expense. At a hearing on the matter, the trial court granted the motion to set aside the scheduling order, thereby allowing St. Cecilia to move for summary judgment.

St. Cecilia filed its motion for summary judgment on January 13, 2021. St. Cecilia argued that Atkins's claim for age discrimination was barred by the ministerial exception because the undisputed evidence showed that, in Atkins's role as an art teacher, the school entrusted her with the responsibility of educating and forming its students in the Catholic faith. St. Cecilia supported its motion with, among other evidence, excerpts and exhibits from Atkins's deposition describing her job position and duties at the school. St. Cecilia also submitted declarations from Kelly, the school's current principal, and Anthony Galla, the ADLA's deputy superintendent of elementary schools, regarding the religious mission of St. Cecilia and the ADLA.

Atkins opposed the motion for summary judgment on two grounds. She contended that St. Cecilia had waived the ministerial exception by failing to plead it as an affirmative defense in its answer. She further argued that, even if not waived, the ministerial exception did not apply to her former position as an office administrator and art teacher. As supporting evidence, Atkins submitted her own sworn declaration

in which she stated that she was not Catholic, and that nonreligion teachers at St. Cecilia were not required to be Catholic or to teach students about the Catholic faith. Atkins also asserted that, in her role as the school's art teacher, she did not teach religion or Catholicism to the students, did not lead the students in prayer or incorporate prayer into her teaching, and did not personally place any Catholic symbols inside her classroom.

On April 29, 2021, the trial court granted St. Cecilia's motion for summary judgment. In its written ruling, the court also sustained all but one of St. Cecilia's evidentiary objections to Atkins's opposing declaration. Focusing on Atkins's deposition testimony describing how she applied the ADLA's tasks of catechesis in her art class, the court found that "St. Cecilia has presented extensive evidence that Atkins has performed various duties within her employment at St. Cecilia that qualifies her for the ministerial exception." The court further explained that "St. Cecilia's evidence, particularly Atkins'[s] own deposition, supports a finding that Atkins'[s] role at St. Cecilia included 'perform[ing] vital religious duties, such as educating [the] students in the Catholic faith and guiding [the] students to live their lives in accordance with that faith' and in accordance with the religious tenants of the school."

On May 24, 2021, the trial court entered judgment in favor of St. Cecilia. Following the entry of judgment, Atkins filed a timely notice of appeal.

## DISCUSSION

On appeal, Atkins contends that the trial court erred in granting summary judgment to St. Cecilia on the basis of the ministerial exception. She specifically asserts that St. Cecilia

11

waived the exception by failing to raise it as an affirmative defense in its answer. Atkins also argues that she was not subject to the exception based on her secular job duties as an office administrator and an art teacher. We conclude that St. Cecilia did not waive the ministerial exception as a defense; however, the school was not entitled to summary judgment because there are triable issues of material fact as to whether the ministerial exception applies to Atkins's former job position.

## I. Standard of Review

The party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact, and that the moving party is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) Where summary judgment is granted, we review the trial court's ruling de novo. (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.) We consider all the evidence that was presented by the parties in connection with the motion (except that which the trial court properly excluded) and all the uncontradicted inferences that the evidence reasonably supports. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) In conducting our de novo review, we liberally construe the evidence in support of the party opposing summary judgment, and we resolve any doubts concerning the evidence in favor of that party. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) We affirm summary judgment only where it is shown that no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

## II. The Ministerial Exception

The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or

12

prohibiting the free exercise thereof." (U.S. Const., 1st Amend.) The ministerial exception, which is grounded in the religion clauses of the First Amendment, operates to preclude application of employment discrimination laws to certain claims arising out of the employment relationship between a religious institution and its ministers. (*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC* (2012) 565 U.S. 171, 188 (*Hosanna-Tabor*).) Under this rule, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." (*Our Lady of Guadalupe School v. Morrissey-Berru* (2020) ___ U.S. ___ [140 S.Ct. 2049, 2060] (*Our Lady of Guadalupe*).) As stated by the United States Supreme Court, the rationale for the exception is that "members of a religious group put their faith in the hands of their ministers," and thus, "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so . . . depriv[es] the church of control over the selection of those who will personify its beliefs." (*Hosanna-Tabor*, at p. 188.)

The Supreme Court first endorsed the ministerial exception in *Hosanna-Tabor*, *supra*, 565 U.S. at page 188. In that case, the Equal Employment Opportunity Commission (EEOC) brought an action on behalf of a fourth-grade teacher, Cheryl Perich, against her former employer, an Evangelical Lutheran school, alleging that Perich had been fired in retaliation for threatening to file suit under the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.). (*Hosanna-Tabor,* at pp. 179–180.) At the time of her discharge, Perich was known as a "called," as opposed to a "lay," teacher. (*Id*. at p. 178.) " 'Called' teachers are regarded as having been called to their vocation by God through a congregation." (*Id*. at p. 177.) To be eligible to receive a call from

13

her congregation, Perich was required to complete extensive coursework in theological study, to obtain the endorsement of the local Synod district, and to pass an oral examination by a faculty committee. (*Ibid*.) Once called, Perich received the formal title " 'Minister of Religion, Commissioned,' " and could be removed only for cause and by a supermajority of her congregation. (*Ibid*.)

The Supreme Court held that the employment action filed on behalf of Perich was barred by the ministerial exception. (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 196.) In recognizing the existence of the ministerial exception, the court declined "to adopt a rigid formula for deciding when an employee qualifies as a minister." (*Id*. at p. 190.) Rather, the court identified four circumstances as being relevant in that case. (*Id*. at p. 192.)

First, the school "held Perich out as a minister, with a role distinct from that of most of its members." (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 191.) When the school "extended [Perich] a call, it issued her a 'diploma of vocation' according her the title 'Minister of Religion, Commissioned.' " (*Ibid*.) "In a supplement to the diploma, the congregation undertook to periodically review Perich's 'skills of ministry' and 'ministerial responsibilities,' and to provide for her 'continuing education as a professional person in the ministry of the Gospel.' " (*Ibid*.)

Second, Perich's title of minister "reflected a significant degree of religious training followed by a formal process of commissioning." (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 191.) Over the course of six years, she completed eight college-level courses in religious subjects, obtained the endorsement of her local Synod district, and passed an oral examination given by a faculty committee at a Lutheran college. (*Ibid*.) After fulfilling these requirements, she was commissioned as a minister "only

14

upon election by the congregation, which recognized God's call to her to teach."  (*Ibid*.)

Third, Perich held herself out as a minister "by accepting the formal call to religious service," and by claiming a special housing allowance on her taxes available only to employees who earned their compensation " ' "in the exercise of the ministry." ' "  (*Hosanna-Tabor*, *supra*, 565 U.S. at pp. 191–192.)

Fourth, Perich's job duties "reflected a role in conveying the Church's message and carrying out its mission."  (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 192.)  Perich taught religion to her students four days per week, and led them in prayer three times per day.  (*Ibid*.)  Once a week, she took her students to a school-wide chapel service, and about twice a year, she led the chapel service by choosing the liturgy, selecting the hymns, and delivering a short message based on Bible verses.  (*Ibid*.)  As a result, Perich "performed an important role in transmitting the Lutheran faith to the next generation."  (*Ibid*.)

The Supreme Court concluded that, "[i]n light of these considerations—the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church—. . . Perich was a minister covered by the ministerial exception."  (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 192.)  The court further concluded that, because Perich qualified as a minister under the exception, "the First Amendment requires dismissal of th[e] employment discrimination suit against her religious employer," regardless of the reasons for the discharge decision.  (*Id*. at p. 194.)  The court explained that "the purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason," but rather to "ensure[] that the

15

authority to select and control who will minister to the faithful . . . is the church's alone." (*Id*. at pp. 194–195, fn. omitted.)

Eight years later, in *Our Lady of Guadalupe, supra*, __ U.S. at page __ [140 S.Ct. at p. 2055], the Supreme Court considered whether the ministerial exception applied to two Catholic elementary school teachers, each of whom lacked the title of minister and had only limited religious training. The teachers, Agnes Morrissey-Berru and Kristen Biel, filed suit against their respective school employers, alleging that they were wrongfully discharged in violation of federal anti-discrimination laws. (*Id*. at p. __ [140 S.Ct. at pp. 2058, 2059].) Like most elementary school teachers, both Morrissey-Berru and Biel taught all subjects, including religion, to their students. (*Id*. at p.__ [140 S.Ct. at pp. 2056, 2058].) Both teachers had entered into employment agreements that set out the school's religious mission, required teachers to serve that mission, and imposed commitments on religious instruction, worship, and modeling of the Catholic faith. (*Id*. at p. __ [140 S.Ct. at pp. 2056–2058].) The agreements also required compliance with the school's faculty handbook, which set out similar expectations. (*Id*. at p. __ [140 S.Ct. at pp. 2057, 2058].) In accordance with those job expectations, both Morrissey-Berru and Biel instructed their students in the tenets of Catholicism under a prescribed religious curriculum, prepared their students for participation in Mass and accompanied their students to Mass, and led their students in daily prayers. (*Id*. at p. __ [140 S.Ct. at pp. 2057, 2059].) Both teachers were evaluated on their fulfillment of their school's religious mission, including whether they infused Catholic values into all of their teaching. (*Ibid*.)

16

The Supreme Court held that the ministerial exception barred the suits brought by Morrissey-Berru and Biel because there was "abundant record evidence that they both performed vital religious duties." (*Our Lady of Guadalupe*, *supra*, __ U.S. at p. __ [140 S.Ct. at p. 2066].) The court explained: "Educating and forming students in the Catholic faith lay at the core of the mission of the schools where they taught, and their employment agreements and faculty handbooks specified in no uncertain terms that they were expected to help the schools carry out this mission and that their work would be evaluated to ensure that they were fulfilling that responsibility. As elementary school teachers responsible for providing instruction in all subjects, including religion, they were the members of the school staff who were entrusted most directly with the responsibility of educating their students in the faith. And not only were they obligated to provide instruction about the Catholic faith, but they were also expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith. They prayed with their students, attended Mass with the students, and prepared the children for their participation in other religious activities." (*Ibid.*)

In reaching its holding in *Our Lady of Guadalupe*, the Supreme Court emphasized that "[w]hat matters, at bottom, is what an employee does." (*Our Lady of Guadalupe*, *supra*, __ U.S. at p. __ [140 S.Ct. at p. 2064].) The court reasoned that, although the titles held by Morrissey-Berru and Biel "did not include the term 'minister,' and they had less formal religious training" than the teacher in *Hosanna-Tabor*, "their core responsibilities as teachers of religion were essentially the same." (Our Lady of Guadalupe, at p. __ [140 S.Ct. at p. 2066].) The court also

17

cautioned that the four circumstances deemed relevant in *Hosanna-Tabor* were "not inflexible requirements and may have far less significance in some cases." (Our Lady of Guadalupe, at p. __ [140 S.Ct. at p. 2064].) Courts must therefore "take all relevant circumstances into account" and "determine whether each particular position implicated the fundamental purpose of the exception." (*Id*. at P. __ [140 S.Ct. at p. 2067].)

## III. St. Cecilia did not waive the ministerial exception by failing to assert the defense in its answer

Atkins first argues that the trial court erred in granting St. Cecilia's motion for summary judgment because the school waived the ministerial exception as an affirmative defense by failing to raise the defense in its answer. We conclude there was no waiver in this case.

The Supreme Court has determined that the ministerial exception "operates as an affirmative defense to an otherwise cognizable claim." (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 195, fn. 4.) Ordinarily, an affirmative defense must be alleged in the answer or it is waived. (*Green v. Healthcare Services, Inc.* (2021) 68 Cal.App.5th 407, 415.) This does not mean, however, that the failure to plead an affirmative defense in the answer necessarily precludes the defendant from raising it in a motion for summary judgment. (*Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 75; *Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 367.) Instead, courts generally have allowed an affirmative defense to be asserted for the first time in a motion for summary judgment "absent a showing of prejudice." (*Nieto*, at p. 75.) As explained by one appellate court: "Given the long-standing California court policy of exercising liberality in permitting amendments to pleadings at any stage of the

18

proceedings . . . we believe that a party should be permitted to introduce [a] defense . . . in a summary judgment procedure so long as the opposing party has adequate notice and opportunity to respond." (*Cruey*, at p. 367.)

In this case, Atkins has not shown prejudice from St. Cecilia's failure to allege the ministerial exception as an affirmative defense in its answer. As St. Cecilia explained in its motion to set aside the March 18, 2020 scheduling order, at the time the parties stipulated to continue the trial date (but not the deadline for filing a motion for summary judgment), the Supreme Court had not yet issued its decision in *Our Lady of Guadalupe*, *supra*, 140 S.Ct. 2049. Accordingly, at that time, St. Cecilia did not believe it had grounds to seek summary judgment based on the ministerial exception. Once the Supreme Court issued the decision in that case, St. Cecilia gave Atkins notice of its intent to assert the defense when it filed the motion to set aside, seeking permission to move for summary judgment based on the exception. Atkins had an opportunity to oppose St. Cecilia's request on both substantive and procedural grounds. After the trial court granted St. Cecilia permission to raise the ministerial exception in a summary judgment motion, Atkins had a full opportunity to oppose that motion on the merits.

Atkins asserts that she suffered prejudice because discovery had closed by the time St. Cecilia filed its summary judgment motion, and thus, she did not have an opportunity to conduct discovery that was tailored to address the ministerial exception. As St. Cecilia points out, however, Atkins could have asked the trial court to continue the summary judgment hearing to allow her to conduct additional discovery pursuant to Code of Civil Procedure section 437c, subdivision (h). While Atkins

19

argued in her opposition that she was prejudiced by St. Cecilia's failure to raise the ministerial exception in its answer, she never requested a continuance so that she could seek any necessary discovery. (See *Roman v. BRE Properties, Inc.* (2015) 237 Cal.App.4th 1040, 1056 [party opposing summary judgment motion must request continuance to conduct further discovery before opposition is due]; *Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1270 [party seeking continuance of summary judgment hearing must submit supporting declaration showing what outstanding discovery is needed to oppose motion].) On this record, St. Cecilia did not waive the ministerial exception as an affirmative defense.

## IV. Triable issues of material fact exist as to whether the ministerial exception applies to Atkins's job position

Atkins also argues that the trial court erred in granting summary judgment to St. Cecilia because her former job position with the school does not fall within the scope of the ministerial exception. Atkins specifically asserts that her job duties as both an office administrator and an art teacher were secular in nature, and did not involve the teaching of religion to the students. St. Cecilia contends that Atkins is subject to the exception because the school entrusted her with educating and forming students in the Catholic faith, and Atkins fully embraced that role in her teaching position. Viewing the evidence in the light most favorable to Atkins, we conclude the trial court erred in granting the summary judgment motion. Because there are triable issues of material fact as to whether the ministerial exception applies to Atkins's former job position as an art teacher

20

and an office administrator, St. Cecilia was not entitled to judgment as a matter of law on Atkins's age discrimination suit.[2]

We begin, as the Supreme Court instructed in *Our Lady of Guadalupe*, with what Atkins did as an employee of St. Cecilia, and what she did not do. Atkins worked for the school on a part-time basis as both an office administrator and an art teacher. In her final year of employment, she taught art on Mondays and Wednesdays, and worked in the office on Fridays and Wednesday afternoons. In her role as an office administrator, Atkins solely performed secretarial or clerical-related duties such as answering phones, photocopying, and maintaining student records. In her role as an art teacher, Atkins taught visual art and art history to students from kindergarten through eighth grade. In Atkins's class, the students would study different artists and then create art projects based on their interpretation of the artists' work.

Unlike the teachers in *Hosanna-Tabor* and *Our Lady of Guadalupe*, Atkins did not teach religion to the students, nor is there any indication in the record that she was required to do so. Instead, Atkins testified that the subject of religion was "taught

---

[2] In challenging the trial court's ruling on the motion for summary judgment, Atkins also contends that the court erred in sustaining certain evidentiary objections that St. Cecilia made to her opposing declaration. Atkins claims the trial court should have overruled these objections because none of the statements in her declaration contradicted her deposition testimony. For purposes of this appeal, however, we need not address the merits of the trial court's evidentiary rulings. Even assuming without deciding that the trial court properly sustained each of St. Cecilia's objections and excluded the challenged statements, the remaining evidence before the court failed to establish that the ministerial exception bars Atkins's action as a matter of law.

by a separate teacher," and that the students were instructed on Catholic doctrine "when they had their religion class." Atkins did include religious methodology in her teaching of art history if the class was "talking about an artist that had information about methodology for religion." She explained, however, that "[t]his was not limited to any particular religion, but rather focused on how religion might have affected a particular artist's work." Additionally, while the students did create some religious-themed art projects in the form of Christmas cards depicting the nativity scene, Atkins did not teach the students about any of the religious aspects of the nativity scene or Christmas. This stands in stark contrast to the teacher in *Hosanna-Tabor*, who "taught her students religion four days a week" (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 192), and the teachers in *Our Lady of Guadalupe*, who "were their students' primary teachers of religion" under a prescribed religious curriculum (*Our Lady of Guadalupe*, *supra*, __ U.S. at p. __ [140 S.Ct. at p. 2067]).

St. Cecilia did present evidence that Atkins would pray with the students by leading them in an "Our Father" or a "Hail Mary" at the end of class if she was teaching art as the last period of the day. Apart from this end-of-the-day prayer, however, there was no evidence that Atkins led the students in any religious activities or services or ever attended such services herself. This is unlike the teacher in *Hosanna-Tabor*, who took her students to a school-wide chapel service once a week and led the service twice a year. (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 192.) It is also unlike the teachers in *Our Lady of Guadalupe*, who regularly accompanied their students to Mass and prepared their students to actively participate in Mass by teaching them

22

about communion and confession.  (*Our Lady of Guadalupe, supra*, __ U.S. at p. __ [140 S.Ct. at pp. 2057, 2059].)

St. Cecilia also presented evidence that Atkins signed a job application in 2012 in which she acknowledged that she was "willing to maintain, by word and actions, a position of role model and witness to the Gospel of Christ that is in conformity with the teachings, standards, doctrines, laws, and norms of the Roman Catholic Church as interpreted by the [ADLA]."  At that time, Atkins also signed a job description for a position that required "[o]ne who actively supports and is expected to conduct themselves in accordance with the philosophy and mission of the Church/School while performing their work."  Both the job application and the job description, however, were for a non-teaching staff position, which according to Atkins, was a position in office administration.  St. Cecilia does not contend that Atkins is subject to the ministerial exception based on the job duties that she performed as an office administrator.  Instead, the school asserts that Atkins qualified as a " 'minister' " within the meaning of the exception "[g]iven the nature of her teaching work."  However, there is no evidence that Atkins ever completed a job application, or received a job description, for a teaching position.  Thus, Atkins's agreement to conduct herself in conformity with the teachings, standards, and mission of the Catholic Church while performing her office position does not demonstrate that St. Cecilia entrusted her as "a teacher with the responsibility of educating and forming students in the [Catholic] faith."  (*Our Lady of Guadalupe, supra*, __ U.S. at p. __ [140 S.Ct. at p. 2069].)

In finding that the ministerial exception applied to Atkins's job position, the trial court primarily focused on her deposition

23

testimony about how she promoted the six tasks of catechesis set forth in the ADLA's Administrative Handbook. Atkins testified that she would "promote the understanding" of these tasks in her class by making sure that the students "did Christ-like things," and that "[i]f their behavior was not Christ-like, [she] would say it's not Christ-like." She further testified that she "practiced [the] Catholic faith every day" she came to class. Referencing the tasks of catechesis, Atkins then explained that this meant the students in her class "would be Christ-like" in that they prayed to "acknowledg[e] their faith," they were told "Jesus is the way to go," and they were taught to "live . . . Christ-like" by not being selfish and by helping others in need. Citing *Our Lady of Guadalupe*, the trial court concluded that this testimony showed that Atkins's role at St. Cecilia included " 'perform[ing] vital religious duties, such as educating [the] students in the Catholic faith and guiding [the] students to live their lives in accordance with that faith.' "

When the full context of Atkins's deposition testimony is considered, however, her description of her role in making sure the students in her art class behaved in a "Christ-like" manner is, at best, ambiguous. While this testimony could suggest that Atkins sought to integrate the Catholic faith into her teaching by educating her students in the faith, it also reasonably could support an inference that Atkins simply encouraged her students to lead moral lives in a way that was consistent with the religious mission of the school. In reviewing an order granting summary judgment to the defendant, we must "liberally construe [the] plaintiff's evidentiary submissions and strictly scrutinize [the] defendant's own evidence, in order to resolve any evidentiary doubts or ambiguities in [the] plaintiff's favor." (*Johnson v.*

24

*American Standard, Inc.* (2008) 43 Cal.4th 56, 64.) The evidence that Atkins promoted "Christ-like" behavior in her class does not establish, as a matter of law, that she performed vital religious duties for St. Cecilia or otherwise qualified as a minister.

Moreover, in viewing the evidence in the light most favorable to Atkins, we cannot ignore the fact that her job position with St. Cecilia was not exclusively that of an art teacher. Over the course of her 40-year employment, Atkins also consistently worked as an office administrator or secretary. In her final year at St. Cecilia, Atkins spent part of her time in the classroom teaching art to the students and the rest of her time in the office performing clerical tasks. St. Cecilia contends that Atkins's office work is not relevant because the Supreme Court in *Hosanna-Tabor* expressly rejected the argument that the ministerial exception " 'should be limited to those employees who perform exclusively religious functions.' " (*Hosanna-Tabor*, *supra*, 565 U.S. at p. 193.) However, the court never suggested that an employee's non-religious functions are immaterial to the analysis. Rather, the court recognized that "the amount of time an employee spends on particular activities is relevant in assessing that employee's status, but . . . cannot be considered in isolation." (*Id.* at p. 194.) Here, the record showed that Atkins performed two essentially separate jobs during her employment, and that her non-teaching office job was purely secular in nature. Atkins's office duties are particularly relevant here because the gravamen of her action is that St. Cecilia wrongfully discharged her by not retaining Atkins as an office administrator and instead replacing her in this role with a younger employee.

"[T]aking all relevant circumstances into account" (*Our Lady of Guadalupe, supra*, __ U.S. at p. __ [140 S.Ct. at p. 2067]),

25

we conclude that there are triable issues of material fact as to whether Atkins's former job position with St. Cecilia falls within the scope of the ministerial exception. While St. Cecilia presented evidence that Atkins prayed with the students in her art class and promoted the ADLA's six tasks of catechesis by encouraging "Christ-like" behavior in her class, there was no evidence that she ever taught, or was expected to teach, any type of religious curriculum. There was also no evidence that Atkins ever led any religious services, accompanied the students to religious services, or prepared the students to participate in religious services or activities. Given that Atkins held dual roles at St. Cecilia as an art teacher and an office administrator, we cannot conclude on this record that educating students in the Catholic faith lay at the core of her job responsibilities. Considering the totality of these circumstances, St. Cecilia was not entitled to summary judgment based on the ministerial exception.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to vacate its order granting St. Cecilia's motion for summary judgment and to enter a new order denying the motion. Atkins shall recover her costs on appeal.

VIRAMONTES, J.

We concur:

STRATTON, P. J.

GRIMES, J.